# EXHIBIT 10
# Second Judicial District Court, Nevada, Complaint Filed November 30, 2022

F I L E D
Electronically
CV22-01929
2022-11-30 12:12:02 PM
Alicia L. Lerud
Clerk of the Court
Transaction # 9384339 : sacordag

SECOND JUDICIAL DISTRICT COURT
RENO, WASHOE COUNTY NEVADA

RAYMOND MAX SNYDER,

Plaintiff

vs.

SHAWN B. MEADOR, ESQUIRE, ATTORNEY FOR LAUARA ANN SNYDER;

BRONAGH M., ESQUIRE, ATTORNEY FOR LAUARA ANN SNYDER;

SHAY WELLS, ESQUIRE, ATTORNEY FOR LAUARA SNYDER;

WOODBURN & WEDGE, RENO, A NEVADA LAW FIRM;

MATTHEW HOWELL ESQUIRE AND

FILLMORE SPENCER; ATTORNEYS REPRESENTING WOODBURN & WEDGE IN THIS MATTER.

AND

ROE BUSINESS ENTITIES A THROUGH X, INCLUSIVE

Defendants

CASE NO.____________________

COMPLAINT FOR:
**I.** RACKETEERING PURSUANT TO NRS 207.470.
**II.** AIDING AND ABETTING
**III.** AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
**IV.** AIDING AND ABETTING AN UNEQUAL DISTRIBUTION OF PROPERTY
**V.** KNOWING THE LOANS TO ADAM WERE REPAID & HAVING MAX'S ATTORNEYS DISMISSED FOR NON-EXISTENT CONFLICTS
**VI.** FORGING ORDERS AND LEGAL DOCUMENTS
**VII.** EMBEZZLEMENT
**VIII.** RECEIVING STOLEN PROPERTY
**IX.** OFFERING FALSE EVIDENCE, FORGING AMENDED TAX RETURNS
**X.** CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION
**XI.** FABRICATING AND OFFERING FALSE EVIDENCE.
**XII.** FRAUD ON THE COURT; and RULE URCP Rule 60(b)(3) FRAUD
**XIII.** INTENTIONAL INFLICTION OF PAIN AND SUFFERING
**XIV.** PAST DAMAGES
**XV.** FUTURE DAMAGES
**XVI**. UNJUST ENRICHMENT.
**XVII**. PUNITIVE DAMAGES
**XVIII.** ATTORNEY FEES
**XVIV.** ELDER EXPLOITATION
JURY TRIAL DEMANDED
Judge:

## INTRODUCTION

1. Plaintiff, Raymond Max Snyder (Max), is a 75-year-old, disabled, proper person. Max complains against Defendants, Shawn B. Meador (Meador), Shay Wells(Wells), Bronagh M. Kelly(Kelly), Matthew Howell (Howell), the law firm of Woodburn & Wedge (Woodburn), and the law firm of Fillmore Spencer (Filmore) and roe business entities a through x, inclusive, as follows:

## PARTIES AND VENUE

2. Defendants, Shawn B. Meador (Meador), Shay Wells (Wells), and Bronagh M. Kelly (Kelly), are residents of Reno, Nevada. Each worked on and is familiar with, the divorce of Lauara Ann Snyder (Lauara), and Max, and Max's Appeal. Meador is a senior partner and shareholder, and associate of the Defendant law firm, Woodburn and Wedge (Woodburn). Woodburn's physical address is 6100 Neil Rd Ste 500, Reno, NV 89511. Matthew Howell (Howell), and the law firm of Fillmore Spencer (Fillmore), 3301 N. University Avenue, Provo, Utah 84620, aided and abetted Defendants Lauara, Meador, Kelley, and Woodburn.

3. Venue is proper in this county because Defendants reside in and/or have done business in Elko County and because events leading to the filing of this Complaint occurred in Washoe and Elko Counties in Nevada.

## INTRODUCTION

4. This action concerns the egregious aiding and abetting by attorneys, Shawn B. Meador (Meador), Bronagh Kelly (Kelly), Shay Wells (Wells), the law firm, Woodburn and Wedge (Woodburn), for their client, Lauara, and Matthew Howell (Howell), and the law firm of Fillmore Spencer (Fillmore), representing Woodburn and Wedge and its attorneys in the State of Utah, employing a severe case, warranting the term of Rule 60(b) fraud on the court and its harsh consequences, using actions amounting to racketeering by; hiding, misrepresenting, and by the

misappropriation of Plaintiff, Raymond Max Snyder's (Max), and Lauara's community property causing injury and loss for Max. Woodburn promotes itself to the public as one of the oldest and most respected law firms in Nevada, and states, "Our attorneys are responsive, trustworthy, and proactive, and as a firm, we are committed to acting in the best interest of our clients." This case also concerns racketeering, fabricating of evidence, forgery in violation of NRS 205.090, NRS 205.463, and NRS 207.360, offering false evidence, perjury, subornation of perjury, embezzlement, forging orders, extortion, receiving and possessing stolen goods…the violations listed in NRS 207.360, but not limited to NRS 207.360(9), (10), (13), (24), (25), (26), (27), (28), by Defendant attorneys, Shawn B. Meador, Bronagh Kelley, Shay Wells, and Matthew Howell, under the authority of Defendant Woodburn and Wedge, a Reno, Nevada law firm. Defendants fit the profile as racketeers in NRS 207.380(1). Defendants Meador, Kelley, Wells, and Howell used the firm of Woodburn and Wedge to further racketeering as defined by NRS 207.390.

5. Lauara owed Max a fiduciary duty and breached that duty as described in NRS 104.3307(1)(a). This case encompasses unlawful aiding and abetting, breach of fiduciary duty, forging orders and other recorded legal documents, including but not limited to orders, Meador's Trial statement, and the Divorce Decree… on the part of Defendant Meador. Through this Complaint, Max seeks to recover more than $10 million in past, future, and punitive damages caused to him by Defendants Meador, Kelley, Wells, Howell, Woodburn, Howell, and Fillmore. Defendant's lawyering violations were pervasive and egregious and continue to this day. They contributed to the divorce court entering a decree on the issues of Max's liability and ordering Max to pay hundreds of thousands of dollars of fees, costs, and sanctions. As a direct result of the Defendants' acts, Max was forced to provide Lauara hundreds of thousands of dollars in unjust awards, and potentially lose his property accumulated over fifty years.

## LEGAL AUTHORITY

6. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 5. as though fully set forth herein.

7. This action is being brought under NRS 104.3307, NRS 87.4336, NRS 207.380(1), NRS 171.080, NRS 195.020, 195.030, NRS 11.190, NRS 11.190(1)(a), NRS 11.190(1)(b), NRS 217.007, NRS 207.360, NRS 207.400, NRS 207.470, NRS 155.165(1), NRS 205.320, NRS 205.2715, NRS 205.275(1)(a) & (1)(e), NRS 205.090, NRS 205.330, NRS 205.220, NRS 205.272, NRS 205.275, NRS 205.020(2), NRS 205.0832(c), NRS 199.210, NRS 193.130, NRS 225.020(1), NRCP Rule 3, NRS 155.010, NRS 125.150(1)(b), NRS 125.020, NRS 42.005, NRS 112.230, NRS 49.035-49.115, NRS 205.463, Utah Code 76-2-202, Utah Code 76-8-502, NRCP & URCP Rule 60(b).

8. Plaintiff's Causes of Action listed above will confirm Defendant attorneys Meador and the other attorneys for the law firm of Defendant Woodburn, Howell, and the firm of Fillmore; and that (1) their client, Lauara, owed a fiduciary duty to her third-party husband, Raymond Max Snyder (Max). (2) Meador, and Woodburn were and are aware of the fiduciary duty owed Max. (3) Meador and Woodburn abetted their client Lauara in breaches of that fiduciary duty. (4) Meador and Woodburn were and are aware of the breach and/or tort committed by Lauara. (5) Meador and Woodburn assisted Lauara in committing the tort and/or breach, and (6) as a result, Max suffered damages.

## NEVADA STATUTES OF LIMITATIONS

9. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. as though fully set forth herein.

**A. Breach of a written contract. 6 years.**

**B. NRS 11.190(1)(a) and (b), within 6 years.**

1. Within 6 years:

(a) Except as otherwise provided in NRS 62B.420 and 176.275, an action upon a judgment or decree of any court of the United States, or of any state or territory within the United States, or the renewal thereof.

(b) An action upon a contract, obligation, or liability founded upon an instrument in writing…

This action is upon a Nevada Divorce Decree recorded September 19, 2020, from the Fourth Judicial District Court. This complaint qualifies under this Nevada 6-year statute.

## I. RACKETEERING MAX'S CIVIL ACTION BROUGHT UNDER NRS 207.470

### C. NRS 207.400 Unlawful acts

Nevada Revised Statutes Chapter 207 - Miscellaneous Crimes NRS 207.520 - **Limitation of actions**. Universal Citation: NV Rev Stat § 207.520 (2021) A … proceeding under NRS 205.322 or 207.400 may be commenced at any time within 5 years after the conduct in violation of the section occurs.

**(i) NRS 207.400 Unlawful acts; penalties.**

1. It is unlawful for a person:

(a) Who has with criminal intent received any proceeds derived, directly or indirectly, from racketeering activity to use or invest, whether directly or indirectly, any part of the proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of:

(1) Any title to or any right, interest, or equity in real property; or

(2) Any interest in or the establishment or operation of any enterprise.

**(ii) NRS 207.520 - Limitation of actions**. Universal Citation: NV Rev Stat § 207.520 (2021) A criminal action or proceeding under NRS 205.322 or 207.400 may be commenced at any time within 5 years after the conduct in violation of the section occurs.

**(iii) NRS 207.360 "Crime related to racketeering" defined**. "Crime related to racketeering" means the commission of, attempt to commit, or conspiracy to commit any of the following crimes:

9. Taking property from another under circumstances not amounting to robbery:

10. Extortion;

13. Forgery;

21. Receiving or transferring a stolen vehicle;

24. Receiving, possessing, or withholding stolen goods valued at $250 or more;

26. Obtaining possession of money or property valued at $250 or more, or obtaining a signature through false pretenses;

27. Perjury or subornation of perjury;

28. Offering false evidence.

33. Any violation of NRS 205.377… Multiple actions involving fraud... in the

The course of the occupation.

NRS 171.080, Theft NRS 205.0832(c), Four years;

**NRS 207.390 – Racketeering activity defined.**

Racketeering activity means engaging in at least two crimes related to racketeering that have the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents, if at least one of the incidents occurred after July 1, 1983, and the last of the incidents occurred within 5 years after a prior commission of a crime related to racketeering.

10. Offenses of this statute include the following: Lauara in concert with her son, Adam Lisk (Lisk), took Max's portion of the property (loans to Adam) under circumstances not amounting to robbery, NRS 207.360(9), (26), (27), and (28).

a. The first crime, Max's and Lauara's loans to Lisk were secretly placed into two of Lisk's LLCs bankruptcies, Old Mill Forestry, and Carol Lynn Properties, in 2010 from which Lisk laundered money (of which Lauara was aware). Lauara was listed as the sole creditor.

b. The second crime came in 2015 when Lisk secretly repaid Lauara the loans during the marriage and Lauara breached her fiduciary duty to inform Max and kept the money. Max first learned of the secret repayments following Lauara's deposition on March 26, 2019, in Reno, Nevada, and Max's investigation through December 2019.

c. Defendants, and the attorney in North Carolina, Christopher M. Theriault (Chris), for Lauara and her sons, Ryan and Adam, allowed Max to sue Adam Lisk, Ryan Lisk, and Lauara in North Carolina knowing the loans to Adam Lisk had been secretly repaid to Lauara.

d. The third crime came at the divorce trial in August 2020 at which Lauara and her Woodburn attorneys insisted the loans be awarded to Max.

e. The fourth crime came in August 2020, after the divorce trial when Lauara and Meador, knowing the loans were uncollectable, threatened to go after Max for half the loan value if Max appealed the Divorce Decree.

f. Lauara's North Carolina attorney, Chris, acknowledged that Lisk had 13 judgments going back to 2003 and up until Max's deposition in 2019. The judgments against Lisk began before Max lent Lisk money.

g. Chris admitted that Lisk had millions and millions in judgments against him, going back to 2003, that he had not repaid.

h. Meador acknowledged in his August 23, 2021, Utah declaration, that Lauara's son Adam was judgment-proof.

i. Meador acknowledged Adam would not repay. This fits the definition of racketeering in NRS 207.390(33) as defined by NRS 205.377.

j. Lauara was a principal and participated with her son in racketeering.

k. Meador, Kelley, and Woodburn aided and abetted Lauara's coverup of her involvement, in the repayment of the Lisk loans, by taking action, not directly related to the crime itself, for the purpose of facilitating its success.

l. Meador, Kelley, and Woodburn's own and separate actions against Max amount to racketeering as defined by NRS 207.390 and include the crimes defined by NRS 207.360(9) & (13) & (24) & (26) & (27) & (28) and (33). Meador, Kelley, and Woodburn fit the term "Enterprise" defined by NRS 207.380(1).

m. Lisk's, Meador's, Woodburn's, Howell's, and Lauara's racketeering all engaged in two or more crimes. Lisk's and Lauara's are defined above, and Meador, Kelley, Howell's, and Woodburn's crimes are those of conspiring to and forging orders, fabricating evidence, embezzling from Max, suborning perjury, offering false evidence, and others defined herein below.

n. Lauara's, Lisk's, Meador's, Kelley's, Howell's, and Woodburn's crimes:

(1) ended with similar results, defrauding and embezzling funds and property from Max;

(2) were done with the same intents stated in (1) above.

(3) found on the same intent, the unlawful acquisition of property from Max;

(3) They followed the same patterns; each intended to steal from Max.

(4) They targeted the same victims, Max and his son, Casey Snyder.

(5) They utilized similar accomplices; Lauara, Meador, Kelly, Howell, Filmore, and Woodburn.

(6) utilized similar methods of commission; unlawful legal actions of forgery, embezzlement, threats, fabrication of evidence, perjury, and subornation of perjury.

(7) have distinguishing characteristics that make them interrelated. The characterization and stamp of each crime were to deprive Max of his property for the benefit of each Defendant. They were not isolated incidents.

o. Perjury and subornation of perjury are civilly actionable under NRS 207.400 and NRS 207.360(27).

> In *State v. Busscher* 407 P.2d 715 (1965), the Nevada Supreme Court upheld a lower court jury finding attorney Busscher had willingly and intentionally suborned the perjury of his client in a divorce case and reinstated with direction to enter judgment thereon and pronounce sentence.

Nevada's anti-racketeering statutes, NRS 207.350 through NRS 207.520, inclusive, were enacted in 1983

> [2] and are patterned after the federal Racketeer Influenced and Corrupt Organizations, or "RICO," statutes, 18 U.S.C. §§ 1961-1968, Like their federal counterparts, Nevada's anti-racketeering statutes provide for a civil cause of action for injuries resulting from racketeering activities under which a plaintiff may recover treble damages, attorney's fees and litigation costs. See NRS 207.470.[3], *Hale v. Burkhardt* Nevada Supreme Court, 764 P.2d 866 (1988).

11. Howell aided and abetted Lauara's attorneys, Meador, Kelly, and Woodburn, in the racketeering and Lauara's fiduciary breach of duty to Max by hiding these facts, and by entering the foreign judgment in Utah resulting from the racketeering.

12. Lauara's attorneys forged orders and other recorded legal documents and knowing allowed Lauara to forge Max's name to amend tax returns in pleadings to extort money from Max in violation of NRS 205.463 and NRS 207.360. This is racketeering. 13.

Lauara and her attorneys offered false, fabricated evidence. This is racketeering.

14. Lauara, with her attorneys' knowledge, transferred the titles of jointly owned

property and money from the couple's joint accounts to companies Lauara controlled. This is racketeering.

15. Defendants were paid with those funds. This is racketeering.

16. Lauara committed perjury that was suborned by her attorneys. This is racketeering.

17. Lauara, with her attorneys' knowledge, forged a premarital and post-marital agreement, a Grand Bargain Sale Deed, amended tax returns, and other documents in violation of NRS 205.090 and NRS 205.463. This is racketeering.

18. Lauara transferred jointly owned property and businesses to her name only. This is racketeering.

19. Lauara and her attorneys stole funds from Max by receiving payment from Lauara's IRAs in violation of NRS 205.275(1)(a) and (1)(e). This is racketeering.

20. The IRAs were the community property of Lauara and Max. In doing this, Lauara and her attorneys violated a financial restraining order in place during the divorce, that had been drafted by Meador and entered by the court on January 24, 2019. This is racketeering.

21. The attorneys also took payment from disbursements Lauara took from a business jointly owned by Lauara and Max. This is racketeering.

22. These actions qualify for a 5-year statute of limitations.

**D. NRS 11.190, Fraud – 3 years. NRCP Rule 60(b)(3) not time limit.**

**STATEMENT OF THE CASE**

23. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 22. as though fully set forth herein.

24. Max and Lauara were married on 10/13/2001. At that time Max was debt-free, and Lauara was underwater with loans to her Nevada businesses and her Nevada residence.

25. Lauara contacted her attorney, Meador, in March 2017.

26. Lauara left Max on 11/20/2017, taking with her all the couple's financial documents.

27. Max filed for divorce in Elko, Nevada on 12/12/2017 commencing the divorce. Lauara filed her counterclaim on January 11, 2018.

28. On January 8, 2018, Lauara filed her response and counterclaim claiming that neither she nor Max were Nevada residents when Max filed for divorce but that she was a resident by the time she signed her counterclaim.

29. On January 24, 2019, Meador drafted and entered a Financial Restraining Order with the divorce court forbidding the parties from disturbing retirement accounts, IRAs, and 401ks.

30. Max's and Lauara's depositions were taken on March 26, 2019, in Reno, Nevada.

31. The divorce trial took place from 08/17/2020 to 08/20/2020 in Elko, Nevada.

32. At the end of the trial, Meador requested the transcripts of the last day of the trial.

33. It was acknowledged the transcripts Meador ordered were to aid his drafting of the Decree.

34. The Divorce Decree (Decree) was entered on 09/11/2020 and filed with the court on 09/25/2020. Max appealed the Decree to the Nevada Supreme Court.

35. On 11/21/2020, an Order to Show Cause Hearing was held in Elko, Nevada.

36. Max was not allowed to attend the hearing.

37. Meador had an order in hand which was signed by the judge without Max's review.

38. On March 22, 2021, Meador drafted an Order for the district court, signed by the court clerk. ordering Max to pay Lauara $4,000 per month.

39. The Decree ordered $2,000 per month, not $4,000 per month.

40. Meador forged the Decree to benefit his client

41. A Writ of Execution for the $4,000.00 per month, double what was ordered, was not provided to Max but was furnished to the sheriff's office to enforce and arrest Max.

42. On 3/31/2021, a second Order to Show Cause hearing was held in Elko, Nevada.

43. Meador prepared the order without Max's review, and the order was signed by the judge.

44. Max was ordered to quitclaim the couple's joint property in Nevada to Lauara.

45. Max was not allowed to review any order prepared by Meador.

Max appealed the Order.

46. On May 5, 2021, another Judgment prepared by Meador was entered by the district court setting the value of the motorhome at $140,000 and ordering Max to pay Lauara $70,000, knowing the motorhome had been substantially "vandalized" while hidden by Lauara.

47. This was on top of the $715,478.85 judgment.

48. The same judgment found Max in non-compliance with the Domestic Relations Order.

49. The Judgment drafted by Meador, on May 18, 2021, had the district court quitclaim the couple's Nevada property to Lauara from a document prepared by Meador.

50. The quitclaim was separate from the $715,478 judgment from the March 31, 2021 hearing.

51. These bogus judgments amount to aiding and abetting and conspiracy under Nevada law and forgeries in violation of NRS 205.090, NRS 207.360(13) and offering false evidence, NRS 199.210.

52. Lauara sold the quitclaimed property for $125,000.

53. Max is entitled to half the sale price or $62,500 plus interest.

54. On May 20, 2021, Max appealed the quitclaim of the Nevada property.

55. On 8/7/2021, the Supreme Court consolidated the Appellant's Appeals Nos. 81887, 82756, and 83029.

56. On November 11/16/2021, the Supreme Court transferred the appeals to the Nevada Court of Appeals.

57. Lauara filed her Respondent's Answering Brief on April 25, 2022. Lauara violated NRAP Rule 30(a) by not allowing Max to be included in a joint appendix.

58. Max filed his Appellant's Response to Respondent's Answering Brief on May 10, 2022.

59. The Court of Appeals disallowed Max's Appendix accompanying his Response to Lauara's Answering Brief under NRAP 30(i).

60. Max filed his Appellant's Motion to have his Answering Brief Appendix allowed where Lauara and Woodburn had declined to allow him to participate in a joint appendix.

61. Without his appendix, Max's reply is discriminatorily incomplete.

62. On April 28, 2022, Max filed with the Nevada Supreme Court, an Appellant's Petition for Review.

## COMPLAINT

## I. RACKETEERING

63. Max's realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 62. as though fully set forth herein.

64. Max's allegations for Racketeering against Defendants are set forth, and the legal statutes given, in 10. through 22. above, and herein below.

- **II. <u>AIDING AND ABETTING, NRS 195.020 and NRS 195.030.</u>**

*Desai v. State* No. 64591 (July 2017), A Defendant can be convicted of aiding and abetting a negligent or reckless crime upon sufficient proof that the aider and abettor possessed the necessary intent to aid in the act that caused the harm.

65. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 64. as though fully set forth herein.

> Nevada's legal definition of **aiding and abetting** is helping, counseling, or encouraging another person(s) – called the **principal** – to commit a crime. People who aid or abet principals in criminal activity are called **accomplices**.

**NRS 195.030 Accessories.**

1. Every person who is not the spouse or domestic partner of the offender and who, after the commission of a felony, destroys or conceals, or aids in the destruction or concealment of, material evidence, or harbors or conceals such offender with intent that the offender may avoid or escape from arrest, trial, conviction or punishment, having knowledge that such offender has committed a felony or is liable to arrest, is an accessory to the felony.

2. Every person who is not the spouse, domestic partner, brother or sister, parent or grandparent, child or grandchild of the offender, who, after the commission of a gross misdemeanor, harbors, conceals or aids such offender with intent that the offender may avoid or escape from arrest, trial, conviction or punishment, having knowledge that such offender has committed a gross misdemeanor or is liable to arrest, is an accessory to the gross misdemeanor.

> 3. As used in this section, "domestic partner" means a person who is in a domestic partnership that is registered or recognized pursuant to chapter 122A of NRS, and that has not been terminated pursuant to that chapter.

66. When brought against lawyers, these in-concert liability claims involve the following elements: (1) a duty owed by the client to a third party; (2) that the lawyer is aware of the duty owed by the client to the third party; (3) that the client breaches that duty and/or commits a tort against that third party; (4) that the lawyer is aware of the breach and/or tort committed by the client; (5) that the lawyer assists the client in committing the tort and/or breach; and (6) that the third party suffers some damage.

67. The more common use of in-concert liability claims against a lawyer is in the context of aiding and abetting a breach of fiduciary duty. To state a claim against a lawyer, the key is for the plaintiff to demonstrate that the lawyer represented a fiduciary to the plaintiff and that the fiduciary/client used those legal services to breach a fiduciary duty owed to the plaintiff.

> L]iability attaches for civil aiding and abetting if the **Defendant substantially assists** or **encourages** another's conduct in **breaching a** duty to a third person. Dow Chemical Co. v. Mahlum, 114 Nev. 1468, 970 P.2d 98, 113 (1998). [Paraphrased] Plaintiffs must prove three elements to show Defendant A aided and abetted Defendant B: **That Defendant B breached a duty to Plainitff,** the result of which injured Plaintiff; That Defendant A knowingly and substantially assisted Defendant B in breaching the duty, and That Defendant A aware of its role in promoting the breach of duty at the time it provided assistance.

a. Woodburn played a key role in this case.

b. Defendants Meador, Kelley, and Woodburn know full well this duty and are listed as attorneys in a recent article by Woodburn covering this very subject. **Nevada Attorney-Client Privilege Review,** by Sam H. Bruketta and John F. Murtha for Woodburn. The following is an extract of that article with the bolding showing the applicability to this Complaint,

WOODBURN AND WEDGE

PAYMENTS

- CONTACT US
- NEWS
- PRACTICE AREAS
  - BANKRUPTCY
  - BUSINESS AND COMMERCIAL
  - EMPLOYMENT
  - ESTATE PLANNING, TAX, PROBATE & GUARDIANSHIP
  - FAMILY LAW & DOMESTIC RELATIONS
  - LITIGATION
  - NATURAL RESOURCES & ENVIRONMENTAL
  - REAL ESTATE
  - TRANSPORTATION LAW
- ATTORNEYS
  - SETH J. ADAMS
  - DANE W. ANDERSON
  - GREGG P. BARNARD
  - GORDON H. DEPAOLI
  - DALE E. FERGUSON
  - SHARON M. JANNUZZI
  - PATRICK M. KEALY
  - MICHAEL W. KEANE
  - BRONAGH M.
  - SHAWN B MEADOR
  - JASON C. MORRIS
  - SHAWN G. PEARSON

- DEBRA B. STIEGLITZ
- DON L. ROSS
- JOSE A. TAFOYA
- SHAY L. WELLS
- W. CHRIS WICKER
- ELLEN JEAN WINOGRAD

- ABOUT US
  - OUR HISTORY
  - THE WOODBURN AND WEDGE DIFFERENCE
  - COVID- 19 RESOURCES
- HOME

**The Nevada Supreme Court recently reviewed Nevada law regarding the attorney client privilege and it declined to recognize a new exception to the privilege known as the fiduciary exception…**

**The attorney-client privilege is codified in Nevada Revised Statutes Chapter 49, Sections 49.035 – 49.115. Generally, the attorney-client privilege allows a client to prevent any person from disclosing confidential communications made by the client to an attorney while seeking legal assistance. However, there are five exceptions to the general rule that may require a party to a communication to disclose the contents of an otherwise protected communication to a third party. The exceptions to the privilege are:**

1. **If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud;…**
2. **Communications relevant to an issue of breach of fiduciary duty by the lawyer to his or her client or the client to his or her lawyer;**
3. **Communications relevant to an issue concerning an attested document to which the lawyer is an attesting witness; or**

**If you have any questions about the administration of your trust, please do not hesitate to reach out to us to discuss your legal options. This firm is committed to keeping client information protected through the attorney-client privilege when applicable.**

In the May 2020 case of Canarelli v. Eighth Judicial District Court, the Nevada Supreme Court held that no fiduciary exception to the attorney-client privilege exists under Nevada law.

c. Defendants knew Lauara hired them to enable her to commit a crime and fraud and, knowingly assisted in that crime and fraud and are exempt from the attorney-client privilege.

In Lubrits, the Nevada Supreme court stated: Lubritz, 113 Nev. 1089, 944 P.2d 861 (1997)at p. 1095: The fiduciary duty among partners is generally **one of full and frank disclosure of all rele- vant information for just, equitable and open dealings at full value and consideration**. Each partner has a right to know all that the others know, and each is required to make full disclosure of all material facts within his knowledge in anything relating to the partnership affairs. The requirement of full disclosure among partners in partnership business cannot be escaped. Each partner must . . . not deceive another partner by concealment of material facts.

59 (A) Am. Jur. 2d *Partnership* § 425 (1987). In addition, a partner's motives or intent do not determine whether his actions violate his fiduciary duty. *Id.* at § 423. Therefore, the appellants owed Lubritz a fiduciary duty of full disclosure of material facts relating to the partnership. The Nevada Supreme court held that: (1) parties intended oral agreement to control manner in which physicians were paid by their corporation; (2) Defendants breached their fiduciary duty to plaintiff; (3) breach of fiduciary duty arising from partnership agreement was separate tort upon which punitive damages could be based; (4) there was clear and convincing evidence of malice supporting punitive damages award; and (5) plaintiff was properly awarded attorney fees. The Lubritz court went on to say: “In addition, a partner's motives or intent do not determine whether his actions violate his fiduciary duty...Despite the contractual source of partners' duties inter se, ... it is well established that when a fiduciary duty exists between the parties, and the conduct complained of constitutes a breach of that duty, the claim sounds in tort regardless of the contractual underpinnings. Id. at 1284 n.24 (quoting Wagman v. Lee, 457 A.2d 401, 404 (D.C. 1983))” (Lubritz, p. 1098). [Emphasis added.]

The Massachusetts case of *Kurker v. Hill*, 44 Mass.App.Ct 184 (1998) provides a typical example of aiding and abetting a breach of fiduciary duty claim.

*Thornwood v. Jenner & Block*, 344 N.E.2d 15 (Ill.App. 2003) provides a classic example of an in-concert liability claim against a lawyer in the context of a fraud claim.

a. Nevada law for conspiracy differs from Federal law in that Federal law requires that the prosecutor prove, beyond a reasonable doubt, that the alleged conspirator committed an “overt act” in furtherance of the intended crime. Nevada law does not require the “overt act” element.

b. In Nevada what constitutes an "overt act?" … the language is intentionally vague so that prosecutors can look for any act that you may have done as part of the conspiracy and argue that it was an "overt act."

68. Max will confirm below: (1) that Defendants Meador, Kelley, Howell and Woodburn aided and abetted their client, Lauara, (2) in breaching the fiduciary duty she owed Max by assisting her in fabricating evidence including false home improvements to Max's home, and cash loans to herself; claiming Max's disability was workers' compensation allowing Lauara to take more than half of the funds, hiding the loans to Lauara's son, Adam, in Adam's bankruptcies then assisting in hiding Lauara's secretly being repaid those loans; taking their attorney fees from Lauara's community property IRAs, and businesses, in violation of the financial restraining order… Defendants were aware of their roles in breaching the fiduciary and in doing so profited by way of attorney fees from their aiding and abetting while intentionally damaging Max by cheating him out of his ownership in Lauara's IRAs and the joint companies.

69. Plaintiff ("Max") complains and alleges as follows:

(1) Max is an individual with a principal address of PO Box 69, Aurora, Utah 84620.

(2) Max is informed and believes and thereupon alleges that the Defendant Meador was at all times a member of the board of directors and a senior partner of the law firm of Woodburn & Wedge, and a Nevada resident residing in Reno, Nevada.

70. Upon information and belief, and at all relevant times, Meador acted in concert with, and in conspiracy with his client, Lauara, his associate, and the law firm of Woodburn, to accomplish the scheme and to commit the acts and omissions in this Complaint.

71. Max is informed and believes and thereupon alleges that Defendant Kelly was at all times an attorney for Woodburn, and a Nevada resident residing in Reno, Nevada.

72. Upon information and belief, and at all relevant times, acted in concert with, and in conspiracy with her client, Lauara, Meador, and the law firm of Woodburn to accomplish the scheme and to commit the acts and omissions in this Complaint.

73. Max is informed and believes and thereupon alleges that Defendant Woodburn is a law firm duly formed and operating under the laws of Nevada, from the address of 6100 Neil Rd Ste 500, Reno, NV 89511. Upon information and belief, and at all relevant times, Meador, Kelly, Wells and Howell acted within, the authority of, and on behalf of Woodburn.

74. Max is informed and believes and thereupon alleges that each of the said Defendants are responsible in some manner for the events and happenings and proximately that caused the injuries and damages herein alleged. Max will seek to amend this Complaint to add any other true names and capacities, whether individual, corporate, associate, or otherwise unknown at this time.

## III. AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY VIOLATING NRS 104.3307

75. Max realleges and incorporates by this reference all allegations outlined in paragraphs 1. through 74. as though fully set forth herein.

76. The rules of intra-partnership duties are set out in *Lubritz*:

> *Clark v. Lubritz*, 113 Nev. 1089, 944 P.2d 861 (1997)at p. 1095: The fiduciary duty among partners is generally one of full and frank disclosure of all relevant information for just, equitable and open dealings at full value and consideration. Each partner has a right to know all that the others know, and each is required to make full disclosure of all material facts within his knowledge in anything relating to the partnership affairs. The requirement of full disclosure among partners in partnership business cannot be escaped...Each partner must . . . not deceive another partner by concealment of material facts. [Emphasis added.] The Lubritz court went on to say: "In addition, a partner's motives or intent do not determine whether his actions violate his fiduciary duty...Despite the contractual source of partners' duties inter se…it is well established that when a fiduciary duty exists between the parties, and the conduct complained of constitutes a breach of that duty, the claim sounds in tort regardless of the contractual underpinnings. Id. at 1284 n.24 (quoting Wagman v. Lee, 457 A.2d 401, 404 (D.C. 1983))" (Lubritz, p. 1098). [Emphasis added.] 59 (A) Am. Jur. 2d *Partnership* § 425 (1987). In addition, a partner's motives or intent do not determine whether his actions violate his fiduciary duty. *Id.* at § 423. Therefore, the

> appellants owed Lubritz a fiduciary duty of full disclosure of material facts relating to the partnership.

**The Fiduciary Duties of a Spouse in a Nevada Divorce.**

In transactions with each other, spouses have a duty to act with the highest Good faith and fair dealing. In addition, neither spouse may take any unfair advantage of the other. Nevada Code further holds that the fiduciary relationship between spouses is subject to the same rights and duties as those applicable to nonmarital business partners. Lauara breached her fiduciary duty to Max as confirmed in I. RACKETEERING MAX'S CIVIL ACTION BROUGHT UNDER NRS 207.470 above.

> In Nevada, a claim for breach of fiduciary duty has three elements: (1) existence of a fiduciary duty; (2) breach of the duty; and (3) the breach proximately caused the damages. *Brown v. Kinross Gold U.S.A., Inc.*, 531_F. Supp. 2d_1234, 1245 (D.Nev.2008). Under Nevada law, partners owe their other partners and the partnership the fiduciary duty of loyalty, which is limited to accounting to the partnership, holding partnership assets as trustee, as well as refraining from being an adverse party, acting on behalf of an adverse party, and competing with the partnership. Nev.Rev.Stat. § 87.4336(1)-(2). Partners also owe a duty of care, which prohibits a partner from engaging in grossly negligent, reckless, or intentional conduct, or knowingly violating the law. *Id.* § 87.4336(3).

78. (1) Max and Lauara had a fiduciary duty to one another as defined by NRS 104.3307(1)(a); (2) Lauara breached her fiduciary duty to Max when she secretly allowed her son, Adam Lisk, to place the couple's loans in his LLC bankruptcies listing Lauara as the sole creditor and was then secretly repaying the loans only to Lauara; (3) The breach of fiduciary duty caused damages to Max who was denied his share of the repaid loans. Lauara's breach of her fiduciary duty to Max was intentional and violated NRS 87.4336(1)-(2) and (3). Defendants

Meador and Woodburn aided and abetted Lauara in a breach of her fiduciary duty owed Max in violation of NRS 195.020 and NRS195.030.

**IV. <u>AIDING AND ABETTING AN UNEQUAL PROPERTY DISTRIBUTION</u>**
***Putterman v. Putterman*. Nevada Supreme Court case No 25598.**

79. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 78. as though fully set forth herein.

a. in *Lofgren*, we approved of a lesser, unequal share of the community property being given to an errant husband who, in violation of court order, had "wasted" or "secreted" community assets. *Id.*

b. As pointed out in *Lofgren*, in 1993, this and other equitable factors were deleted from the statute; and the amended statute commanded *equal* rather than equitable disposition.

c. Because of the 1993 legislative change from equitable to equal disposition of community property, we now hold that it was an error for the district court to divide the Puttermans' community property "fairly and equitably" without the statutorily mandated finding of "compelling reasons" for an unequal disposition.

d. In *Lofgren*, we defined one species of "compelling reasons" for unequal disposition of community property, namely, financial misconduct in the form of one party's wasting or secreting assets during the divorce process. There are, of course, other possible compelling reasons, such as negligent loss or destruction of community property, unauthorized gifts of community property and even, possibly, compensation for losses occasioned by marriage and its breakup. *See, e.g.*, *Moge v. Moge*, 3 S.C.R 813, 43 R.F.L.3d 345 (Canada 1992); *DeLa Rosa v. DeLa Rosa*, 309 N.W.2d 755 (Minn.1981) (compensation (not favorable property allocation) granted to wife as "reimbursement" for her support of husband while he obtained a medical degree).

80. The Divorce Decree was drafted by Meador.

81. The Divorce Decree awarded Lauara substantially more including her attorney fees because Max was labeled a vexatious litigant by Meador.

82. The word vexatious was never spoken in the divorce, nor was it stated in any of the pleadings leading up to trial.

83. Meador filed 136 pre-trial pleadings on Lauara’s behalf prior to trial to Max’s 26 pre-trial pleadings.

84. Many of Lauara's pretrial pleadings were identical, each requiring Max to respond, wasting valuable time and resources.

85. Lauara was the vexatious litigant.

**Financial Restraining Order (FRO) and Community Property IRAs and Violations by Lauara and Defendants of NRS 205.300, NRS 207.400, and NRS 207.360(9), (10), and (24-29).**

86. The couple's IRAs were community property.

87. Lauara paid her attorney fees from her IRAs, in violation of the FRO, and testified on August 20, 2020, that she had and that in June 2019 she had reduced the one IRA to $197,000. This was a violation of the FRO.

88. Lauara also violated the FRO by paying Max's son Casey's court-ordered awards from her IRAs.

89. Following all the disbursements from Lauara's IRAs she had a balance of $76,276 in her IRAs.

90. Max's, IRA which he had not touched because of the FRO totaled $186,580.

91. In March 2019, before taking disbursements to pay Meador, Lauara's two IRAs held more than $309.000. The disbursements violated the FRO and the transfers would have four-year statutes of limitations under NRS 112.230 and five years under NRS 207.400, (iii) 207.360(9).

92. Combining Lauara's depleted IRAs and Max's IRA following Lauara's disbursements to pay Meador, the couples IRAs totaled $260,858. The order drafted by Meador ordered the IRAs combined and each party to receive $130,429 and for Max to pay Lauara $54,153 from his now larger IRA to equalize his with Lauara's.

93. The Order, with false information, was a forgery under NRS 205.090 and violated

NRS 188.120, offering false evidence.

94. The forged Order, with the false information, forced Max to further contribute to paying Meador's, and Woodburn's attorney fees from Lauara's community property IRAs.

95. Following the Decree being entered, Max was forced to withdraw his entire IRA to protect the funds and to finance his ongoing legal battle.

96. As a result of Lauara and Meador's forged Order, Max was forced to pay 33% taxes on the IRA withdrawals, and a $500.00 per month increase in his Medicare deduction from his Social Security, resulting from increased wages.

97. Lauara, Meador, Kelley, and Woodburn are responsible for the over $60,000 Max had to pay in taxes from his IRA withdrawal and the monthly Medicare increase.

98. Following the trial, Meador sent Max a settlement offer. On pg. 2 of Meador's offer, it is acknowledged again Max was ordered to combine his full IRA with Lauara's IRA depleted by disbursements, (payments to Meador), and split the total equally leaving Max a total of $125,000 from his $184,000 IRA.

99. Lauara took disbursements from MESA Business Complex (MESA) to pay her attorneys. As MESA was a joint asset with Max, was a violation of NRS 205.300, NRS 207.400 and NRS 207.306(9), (10), and (24-29), and NRS 104.3307, this was a violation by Lauara and Defendants.

100. MESA Business Complex was a jointly owned property by Max and Lauara.

101. Lauara's Trial Exhibit C's Exhibit 2, the company's QuickBooks accounting document confirmed that Max and Lauara each had $72,946.50 equity in Mesa Business Complex.

102. The couple's 2015 tax returns, Schedule E, prepared by the company accountant

and signed by the accountant and by Max and Lauara, confirmed MESA business complex at 427 Mesa Street was jointly owned. The couple's 2015 joint tax return amended by Lauara and the company accountant in 2021 confirmed that the MESA business complex and the Wendover home at 637 Mesa Street were jointly owned and that both properties were rental properties. The home at 637 Mesa was not a rental. The accountant confirmed twice that the property was jointly owned.

103. The couple's 2016 tax returns signed by both parties and the company accountant, in October 2017, a month before Lauara left, showed Mesa was jointly owned. The couple's 2016 joint tax return amended by Lauara and the company accountant in 2021 confirmed that the MESA business complex at 427 Mesa Street and the Wendover home at 637 Mesa Street were jointly owned and that both properties were rentals. The home at 637 Mesa Street was not a rental. Lauara did this to obligate Max to more taxes. Lauara and the accountant confirmed twice that the property was jointly owned. On April 15, 2002, five months after the couple's marriage, Lauara and her office manager, Tammy Brown, secretly forged Max's name to a Grant Bargain Sale Deed and deeded the Wendover Nevada Home to Lauara while Max was working 300 miles away near Las Vegas in violation of NRS 205.090, NRS 205.463 and NRS 207.360.

104. Max had an Expert CPA Witness prepared to testify at trial, Tori Warren, (Ms. Warren). Following Ms. Warren citing her qualifications, Judge Estes stated, "She's absolutely qualified as a CPA as far as I'm concerned"; thus certifying Ms. Warren.

> Once district court certifies expert as qualified, expert may testify to all matters within expert's experience or training. N.R.S. 50.275. *Dow Chemical v. Mahlum.*
>
> Once the district court certifies an expert as qualified, the expert may testify to all matters within the expert's experience or training. *See Fernandez v. Admirand,* 108 Nev. 963, 969, 843 P.2d 354, 358 (1992).

105. At trial, Ms. Warren had a binder containing her full reports on each of the Nevada businesses that included several sections, and another two-page report. Ms. Warren's report was Plaintiff's Exhibit 24.

106. At trial, Lauara acknowledged that Ms. Warren's report contained several documents including flow charts and that there was a document that confirmed that Max and Lauara co-owned Mesa Business Complex, MESA.

107. That document was the couple's 2015 tax returns prepared and signed by the company accountant and by Max and Lauara.

108. At trial, Meador stated Ms. Warren's report expressed opinions beyond what CPA would be able to express, a violation of NRS 207.306 (28).

109. Meador falsely claimed he never had seen the documents except for the two-page report, even though he had provided a Stipulation of what he insisted Ms. Warren bring to her deposition and Ms. Warren complied and brought the same binder of documents.

110. Meador then contradicted himself admitting that there were other documents in Ms. Warren's file at her deposition that he requested but they were not presented as her report.

111. Meador stated "there is a flowchart that's wildly inaccurate. It shows Mesa Business Complex co-owned by Max and Lauara, and we know there are no documents to support that whatsoever."

112. Mr. Meador knew this statement was false. Meador had reviewed Ms. Warren's report and knew it contained the couple's 2015 tax return and that document confirmed each owned 50% 0f MESA.

113. Max's Trial Exhibit 12 was the couple's 2015 tax return that showed 50% joint ownership.

114. Lauara's Trial Exhibit C's Exhibit 2, the company's QuickBooks accounting document, confirmed that Max and Lauara each had equal equity in MESA.

115. This document must be allowed under NRCP 16.2(i)

116. Lauara testified that the Company QuickBooks showed she and Max jointly owned Mesa Business Complex and Max did not have access to the bookkeeping.

117. Meador committed perjury and suborned the perjury of his client, NRS 207.360.

118. The statute of limitations, in this case, is set at 6 years under NRS 11.190(1)(a) and (b), and 5 years under NRS 207.400 Unlawful acts.

119. Meador claimed he was provided only two pages of Ms. Warren's report.

120. However, Meador acknowledged he had seen Ms. Warren's full report binder. This violates NRS 207.360(27-28).

121. Though Meador claimed he had not seen the binder, it was acknowledged as being provided to him at Ms. Warren's deposition as cited in a portion of the deposition transcript provided below.

122. Though Meador claimed he had not seen it, it was acknowledged as being provided to him at Ms. Warren's deposition a portion of which is provided below.

> ·Q· · What did you do to prepare for this deposition that took 24· you almost seven hours? 25· · · ·
> A· · Just reviewing, going through all of the emails, all of Page 10 ·1· the documents that I used to compile a binder that I did of all ·2· the exhibits, and just reviewing everything so that I was -- it ·3· may not seem like it, but more familiar with it. ·4· · · ·
> Q· · I have a white binder in front of me that is copies of ·5· the documents that Ms. Amens produced to me that she reported or ·6· represented were the documents from your file. ·
> A· · Right

123. Meador admitted the documents had been produced by Max's attorney at the time by Ms. Amens.

124. Following Meador's false statements, Judge Estes declined to allow any part of Ms. Warren's report, because he "saw no professional CPA report."

125. The judge who praised Ms. Warren's qualifications was not qualified to state what a CPA report should look like.

> Once the district court certifies an expert as qualified, the expert may testify to all matters within the expert's experience or training. *See* Fernandez v. Admirand, 108 Nev. 963, 969, 843 P.2d 354, 358 (1992).

126. Ms. Warren was disallowed by the court without the authority under NRS 50.275 to do so.

127. Lauara paid legal fees from disbursements from the jointly owned company, MESA. Thus, Max further contributed to the payment of Lauara's attorney fees.

**Transferring a Jointly Owned Vehicle to Her Company, Violations of NRS 207.360(9) and (21).**

128. Max and Lauara jointly owned a custom Ford F550, "pickup" which Lauara transferred to a business controlled by her, without Max's knowledge, and without reimbursing Max, while she and Meador were planning the divorce.

129. Lauara also transferred a jointly owned F350, an ambulance, and an Isuzu box-truck to companies controlled by her, without Max's knowledge.

130. These transfers violate NRS 205.080(c), NRS 205.2715, auto theft, and NRS 207.360 No. 21, Racketeering, and they violate Lauara's and her attorneys' fiduciary responsibility to Max.

131. Secreting or wasting community assets while divorce proceedings are pending is punitive. The Nevada Supreme Court in Williams v. Williams 97 P.3d 1124 (2004) stated:

> We conclude that the application of community property principles to a putative marriage, as indicated in Sanguinetti v. Sanguinetti,[24] is the better approach to the division of property in such cases.[25].

132. The F550 vehicle cannot be replaced for less than $50,000.

133. Max seeks reimbursement for the F550 with an identical vehicle.

**Depleting the community accounts, Violations of NRS 207.360(9), (25), (26), and (28).**

134. Following retaining Meador and Woodburn, Lauara began depleting the couple's joint account, sending large sums of money to companies under her control. Two days after Lauara took $913,950 from the companies jointly owned by her and Max.

**Stealing Max's Disability Award, Violations of NRS 205.300, NRS 207.360(9),(24), (25), (26), (28), and NRS 207.400.**

135. Max was awarded a permanent total disability (PTD) with account No. 197-A53639.

136. Max last worked in December 2017.

137. Max opened a separate disability account when he began receiving disability benefits.

138. Lauara acknowledged it was Max's account only.

139. Subsequent to a back injury prior to the couple's marriage, Max is on a lifetime disability and is not required to return to work.

140. The funds Max deposited in his separate disability account were never workers'

compensation as Lauara claimed at trial.

141. Max had one disability amount wired to the joint account because that was the only account he had set up at the time to receive a wire.

142. The wired funds were moved to Max's disability account within a month.

143. Nevada treats disability income as the separate income stream of the employee spouse. *See Powers v. Powers* 105 Nev. 514 P.2d 91 (1989).

144. Lauara testified at trial that Max's disability was workers' compensation that was briefly sent to their joint account and then transferred to Max's separate Disability account.

145. Lauara testified that the biweekly $1,500 checks were for workers' compensation, but that Max was not required to go back to work.

146. As a result of her testimony, suborned by Meador, in violation of NRS207.360(27) and (28), Lauara was awarded half of Max's lifetime disability.

147. Workers' compensation is paid up to the time a recipient can return to work. Max returned to work in December 2016 and worked to December 2007 before retiring. Upon retiring Max received two Ironworker's Pensions and Social Security. These income sources were deposited into the couple's joint account. They amounted to and replaced what Max received as wages during his work career.

148. The $1,500.00 checks that began in 2015, with the same claim No. 197-A53639 as the disability award were for a Permanent Total Disability (PTD), not workers' compensation.

149. At Max's deposition on March 27, 2019, Meador stated he "understood" Max was on a court-ordered disability, not workers' compensation.

150. At trial, 15 months later in August 2020, Lauara committed perjury stating it was workers' compensation. Meador and Woodburn suborned that perjury.

151. This is a violation of NRS 207.360(27) and (28)… statute of limitations of 5 years, and a violation of NRS 207.400.

152. As a result of Lauara's perjury and her attorneys' subornation, Lauara was awarded $109,063 from Max's disability account, and then another $75,000 from the same account for fees Max had paid to his attorney, Justin Heideman (Heideman), from his disability account.

*Cosio v. State of Nevada*, 106 Nev. 327, 793 P.2d 836 (1990). In *Cosio*, the Defendant was convicted of perjury after he falsely testified before the divorce court.

*Ex Parte Sheldon*, 44 Nev. 268, 193 P. 967 (1920), in which the attorney, and not the client, was prosecuted for subornation of perjury.

In *State v. Busscher* 407 P.2d 715 (1965), the Nevada Supreme Court upheld a lower court jury finding attorney Busscher had willingly and intentionally suborned the perjury of his client in a divorce case and reinstated with direction to enter judgment thereon and pronounce sentence.

153. The Decree falsely stated that Max paid Heideman from community funds.

154. Lauara was ultimately awarded a total of $184,003 from Max's disability checking account holding $218,127.

155. In addition to this, Max had placed over $169,853 of his disability checks in the couple's joint account which he disclosed during discovery.

156. Adding Max's disability deposited to the joint account and the $218,127 deposited into his separate account, the totals from Max's disability amount to $352,856, plus interest, which Lauara and Defendants are responsible to pay Max.

157. Lauara paid for improvements to her separate New Mexico rental property from the couple's joint account. Lauara did not declare the income from her rental property in her financial statement.

**Professional Services and Consulting (PSC).**

158. The Decree ordered that PSC was community property and that it was to be closed, the assets sold, and the proceeds split.

159. Lauara changed the name of PSC and retained the assets.

160. Meador claimed the court did not award Max an interest in PSC and supported Lauara's refusal to provide Max his share of the company awarded him or the company's tax information. This is a violation of NRS 207.400, and NRS 207.360(9).

161. PSC was the company that allowed Wendover Ambulance and the other Nevada companies to operate at a profit by leasing employees to them. Lauara acknowledges that she retained PSC in violation of the Decree

162. The Ambulance service cannot operate at a profit, without PSC. Max believes the value of PSC to be at least $1,000,000.

163. Defendants are liable to Max for half the company's value or $500.000.

**Lauara's claim Max Attempted to Sell Wendover Ambulance, in Violation of NRS 207.360(28).**

164. The Divorce Decree states Max tried to sell Wendover Ambulance.

165. This statement attributed to Meador is false. Max could not sell the ambulance service nor did he sign anything acknowledging he could.

166. Max contacted ReachAir seeking the value of Wendover Ambulance and the company's interest in purchasing it once Max was awarded a community property interest.

167. Max and ReachAir were exploring a value for the company between $1.5 and $4 million.

168. Defendants are liable to Max for half the value of Wendover Ambulance or $2,000,000.

**Mountain West, Inc.**

169. Lauara and Max signed a 2005 SBA financial statement confirming that Max was a part owner of Mountain West, Inc. This was Plaintiff's Trial Exhibit 15.

170. The trial transcripts referencing Exhibit 15 were admitted at trial.

171. Exhibit 15 confirmed that Max was both an owner of the Nevada businesses and that Max's separate property guaranteed the SBA loans.

172. The trial transcripts confirm the second box down shows the parties each own a minimum of 20% of the businesses.

173. Max's life insurance and personal property were listed to guarantee the loan.

174. The company's 2013 SBA financial statement confirms that the community property F550, loans to Adam, Loans to Mountain West, Inc., and the Nevada home, all community properties, were used to guarantee the SBA loans.

175. Lauara funneled the couple's community funds to Mountain West Inc. through Wendover Ambulance and paid the company tax's from transferred community funds.

176. Meador and Lauara orchestrated this transfer to see that Lauara was awarded all the businesses under Mountain West, Inc.

177. Audio Tape A was disclosed for trial.

178. The transcripts of Tape A confirm Max was told by Lauara that he was a 50% owner of the Nevada businesses.

179. When Lauara breached a contract with US Welding, US Welding sued Mountain West, Inc, DBA Lisk Parts, Max and Lauara paid the attorney fees from their joint checking account.

## V. KNOWING THE LOANS TO ADAM WERE REPAID & HAVING MAX'S ATTORNEYS DISMISSED FOR NON-EXISTENT CONFLICTS OF INTEREST IN VIOLATION OF NRS 207.360(28).

180. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 179. as though fully set forth herein.

**Loans to Lauara's Son, Adam Lisk.**

181. During the marriage, Max and Lauara made loans to Lauara's son, Adam Lisk (Lisk), in North Carolina.

182. Lauara claimed at trial the loans to her son, Adam, had not been repaid, and that Lisk made an $85,000 payment on the loans.

183. Lauara's 2018 Financial Statement confirms that there were $168,000 in loans receivable from Adam and $72,091.00 from Wendover Ambulance Service (WAS).

184. Lauara's 2020 Financial Statement showed $0.00 loans receivable from Adam and $72,091 from the WAS notes.

185. At trial, Lauara insisted the notes to WAS be awarded to both parties,

186. Lauara's 2013 SBA Financial Statement showed the notes payable from Mountain West, Inc., which is Wendover Ambulance, were $91,731.

187. Lauara's 2009 joint personal financial statement for the couple's Credit Union showed that she and Max had outstanding notes due from Mountain West, Inc. for $128,206, and

Adam Lisk for $170,000. The companies had paid the couple's credit card debt that had been sed to support company operations.

188. The jointly owned company, Mesa Business Complex, paid the SBA loans.

189. Max and Lauara began making loans to WAS in 2004 when they purchased Wendover Ambulance from Larry Lisk, Lauara's ex-husband..

190. The notes were made at 7% interest, to Mountain West, Inc., to pay off Lauara's ex-husband Larry Lisk, for the purchase of Wendover Ambulance.

191. There is no company accounting documents to confirm that any portion of the WAS notes was ever repaid.

192. Using Lauara's most reliable record of these notes, the couple's 2009 credit union financial statement, confirmed the loans were $128,206, with no payment having been made. The notes are now valued at over $319,517.14.

193. The Divorce Decree failed to mention the loans to WAS allowing Lauara to retain them.

194. Without Max's knowledge, Lauara allowed her son Adam to place the couple's loans to him in his bankruptcy.

195. This is a breach of Lauara's fiduciary duty to Max.

196. At her deposition in March 2019, Lauara testified the loans to Lisk totaled $650.000.

197. These loans included money Lauara wired her son, unbeknownst to Max, from the companies.

198. Lauara's deposition confirms Max is an owner of all companies.

199. With Max unaware of their loans being placed in Adam's bankruptcies, Lauara

allowed Adam to launder money from these bankruptcies without Max's knowledge.

200. Lauara acknowledged Max sued Adam on behalf of Lauara and himself to recoup the loans.

201. Lauara had allowed her son to put their loans in his LLC Bankruptcies listing Lauara as the sole creditor for $210,000 and $440,000 at a total of $650.00.

202. At trial, Lauara insisted the loans be awarded to Max.

203. The Lisk loans were awarded to Max.

204. Lauara/Meador then threatened to go after Max for half the loan value if he appealed the Decree.

205. This violates NRS 205.320, Extortion, and NRS 207.360(10).

206. The bankruptcy court documents provided to Lauara confirmed that all creditors, including Lauara, were repaid.

207. The bankruptcy court confirmed the inside unsecured creditors were paid in full.

208. Lauara's 2020 financial statement acknowledges that she was repaid the loans. Meador furnished the financial statement and knew the loans had been repaid.

209. Max's first attorney was dismissed for representing both Max and Lauara going after the loans.

210. Max's second attorney was forced to withdraw for the same issue.

211. Max's third attorney, Heideman, was dismissed for a non-existent conflict of interest as the loans had been repaid

212. Max's fourth attorney, Aaron Bushur (Bushur), had the same conflict of interest as Max's first two attorneys.

213. Lauara and her attorneys allowed Bushur to represent Max although they had

Max's previous attorneys removed for the same purported conflict.

214. Bushur withdrew from representing Max going after the loans to Adam on behalf of Max and Lauara, four months after the divorce.

215. Claiming Max's attorneys had conflicts of interest and having them removed, cost Max hundreds of thousands of dollars and difficulty keeping an attorney's up to speed.

216. Following Lauara's deposition, Max began looking into Adam Lisk's bankruptcies.

217. In December 2019, Max discovered that Lauara was repaid the loans.

218. Lauara and her attorneys continued claiming the loans were still owed when she and Meador knew the loans had been repaid in 2015 and had the loans awarded to Max in violation of NRS 207.360(27) and (28).

219. In his Plaintiff's Response to Defendant's Opposition to Plaintiff's Second Motion for Sanctions… filed with the court on 12/2/2020, Max confirmed again, in his Exhibit 8, that Lauara had been repaid the loans.

220. Knowing the loans were repaid to Lauara, she and her attorneys allowed Max to sue Adam and Lauara's other son, Ryan, who also knew the loans had been repaid.

221. The loans to Adam, awarded to Max, are now worth more than $1.8 million.

222. Meador threatened to sue Max for half the loans if he appealed the Decree. This violates NRS 207.360(10).

223. Meador and Woodburn are responsible to Max for his attorney fees and for $1,800,000 or whatever the amortization of the loan's value is at the time of settlement.

224. Lauara committed Rule 60 fraud in having Max's attorneys removed. Once the loans had been repaid: No conflict existed.

225. This has a 6-year statute of limitations under NRS 11.190(a) and a 5-year under NRS 207.400, and NRS 207.360(27) perjury and subornation of perjury, and (28) offering false evidence.

## VI. FORGING ORDERS A VIOLATION OF NRS 205.090, 205.AND NRS 207.360(13).

226. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 225. as though fully set forth herein.

227. Max will cite only a few of several instances of forgery in the Divorce Decree.

228. On the last day of the trial, it was confirmed Meador would draft the Decree.

229. Meador ordered the last day's trial transcripts for this purpose.

230. Under NRS 171.080 & 205.090 this has a four-year statute of limitations.

### A. Divorce Decree.

231. The divorce commenced on December 12, 2017, the day Max filed for divorce.

232. Lauara's response and counterclaim were filed on January 11, 2018.

233. Paragraph 1. of Lauara's counterclaim stated she had been a resident of Nevada for more than 6-weeks prior to filing her counterclaim.

234. Paragraph 2. of Lauara's counterclaim stated Max had not resided in Nevada six weeks prior to filing for divorce and thus was not a Nevada resident.

235. NRS 225.020(1) requires a party to be in Nevada 6 weeks prior to filing for divorce.

236. NRCP Rule 3., Commencing an Action: A civil action is commenced by filing a

complaint with the court.

The Nevada Supreme Court ruled:

"no court has jurisdiction to grant a divorce unless either the plaintiff or Defendant has been a resident of the State for a period of not less than 6 weeks preceding the commencement of the action." Nevada Supreme Court, *Senjab v. Alhababi* 137. Adv. OP No. 64 P.3d (October 21, 2021) (quoting Vaile v. Eighth Judicial Dist. Court, 118 Nev. 262, 269-70, 44 P.3d 506, 511 (2002) (quoting *Aldabe v. Aldabe,* 84 Nev. 392, 396, 441 P.2d 691, 694 (1968)).

237. At trial, Lauara testified the couple lived in Utah until 11/20/2017.

238. Max filed for divorce on 12/12/2017, three weeks and five days after Lauara left Utah in the couple's RV on 11/12/2017.

239. Lauara and her attorneys planned to discredit Max and claim that Max had not resided in Wendover, Nevada with Lauara for more than six weeks, in 2008 and thus did not qualify as a resident. They planned to get the court to allow Lauara's argument that neither party had lived in Nevada for six weeks before commencement however since Lauara was a resident by the time she signed her counterclaim, she would be allowed to continue the divorce on the counterclaim that her counterclaim was the commencement of the divorce. They knew Rule 3 and the Nevada Supreme Court cases confirmed otherwise. Meador, Kelly, Wells, and Woodburn allowed the divorce to continue deliberately wasting everyone's time and resources hoping, at trial, they could put a spin on the fact that Lauara was a resident at commencement. As a result, they are responsible for all costs to date.

240. Lauara, the Defendant, was not a resident when the divorce commenced. However, the Decree states:

> Defendant has resided in the state of Nevada for a period of more than six (6) weeks immediately preceding the commencement of this action… The court finds there is jurisdiction over both parties.

241. Under Lauara's argument, neither party was a resident at commencement and the Divorce Decree is a forgery per NRS 205.090 and NRS 207.360(13).

242. The Decree states on pg. 3, No. 7, "*Plaintiff's actions and behavior have constituted waste of the community estate, especially concerning the frivolous North Carolina Suit", (the suing Lisk for the loans referenced above).

243. It is confirmed above that the bankruptcy court documents provided to Lauara confirmed that all creditors, including Lauara, were repaid in or around 2015 in violation of NRS 207.360(9),(26), and (27).

244. Lauara allowed Max to sue Lisk, with the knowledge that all creditors had been repaid.

245. Lauara was the one who deliberately wasted community property and the Decree is a forgery.

246. The Decree states on pg. 2. g. *Plaintiff is found to be in contempt of court for paying Justin Heideman Esq. $150,000 in community funds in violations of this Court's Orders*.

247. There was no court order preventing Max from paying Heideman $150.000.

248. Max retained Heideman, with a check from his disability account, to file a motion to allow the joint representation of Max and his son Casey.

249. Following retaining Heideman to explore if the court would allow Heideman to represent Max, Heideman filed a Motion with the court to be allowed to so do.

250. The court denied the Motion for joint representation.

251. The $150,000 from Max's separate disability account is confirmed above.

252. The Decree is a forgery, and Meador fabricated evidence in violation of NRS 360(13). The first time was in his Trial Statement.

253. Meador's Trial Statement was converted into the Decree. The Trial Statement contained several falsehoods and was used to draft the Decree,  a violation of NRS 207.360(13) and NRS 199.210.

254. At trial, Lauara insisted the notes to WAS be awarded to both parties,

255. The couple's loans to WAS were not mentioned in the Decree, thus allowing Lauara to retain the loans.

256. Again, the Decree is a forgery.

**B. Order, November 10, 2020 Order to Show Cause Hearing.**

257. On October 5, 2020, Max filed a motion to be allowed to attend the November 10, 2020 Order to Show Cause, by telephone because of chronic health issues and it was at the height of the Pandemic.

258. In his motion, Max included an order from his treating physician supporting this.

259. The November 10, 2020 Order to Show Cause Hearing was canceled by the court. Max was notified by email.

260. On November 3, 2020, Meador filed a Notice to reschedule the Hearing on the same day**.**

261. The Hearing was rescheduled by Meador without properly notifying Max per NRS 155.010 which required 10 days.

262. Max was emailed notice of the rescheduled hearing, on the morning of the Hearing.

263. Without time to make the Hearing, Max responded to the email immediately to all

parties including Meador, the judge, and the court stating he just received the Order and asked to do the hearing telephonically for his health reasons. Max also lived 475 miles from Elko.

264. Again, this was at the height of the Covid-19 shutdown.

265. The judge acknowledged Max had not been informed of the hearing and declined Max's request to attend by phone.

266. Meador rescheduled the canceled hearing yet falsely stated Max had known about the hearing for over a month and that Max had filed a motion to appear telephonically. 267. The judge stated he did not approve of a telephonic hearing.

268. Meador falsely stated Max had proper notice of the hearing so Max could not deny he was not allowed his due process. This violates NRS 207.360(27) and (28).

269. Max was denied due process.

270. At the hearing, with a pre-prepared Order in hand, Meador approached the bench, and the judge signed it.

271. Meador committed perjury and forged an Order in violation of NRS 205.090 and NRS 207.360(13), (27), and (28).

272. The Order signed in open court and entered the same day stated there was no timely opposition filed.

273. The Order contained the same forgeries as the Decree.

**C. Order After Hearing On March 31, 2021.**

273. Lauara and Meador's fabrications and perjury in this Order are numerous and require a review of the hearing transcripts, and Max's MOTION FOR RELIEF UNDER NRCP 60(b)(3) AND RULE 11, FOR FRAUD ON THE COURT BY: ATTORNEY SHAWN MEADOR AND DEFENDANT LAUARA ANN SNYDER. Max will cite just a few forgeries

listed by Meador in the order he prepared. These are found in the Order, Items A through… Item G.

275. The Order states: *Mr. Snyder transferred water rights awarded to Ms. Lisk to a friend.* This statement is false and was never confirmed anywhere in the hearing transcripts or by any documentation. This is a violation of NRS 207.360(13), (27), and (28).

276. Lauara testified that the funds' Max used to purchase water rights came from community property.

277. This statement was not confirmed by documentation.

278. Max was forced to transfer the water rights awarded to Lauara that he had purchased with his separate funds and sold the rest to persons he had never met.

279. Meador declined to furnish the court the documents he claimed he had in hand, which he said they had just received, confirming Max sold the water rights awarded Lauara.

280. Max transferred the shares awarded to Lauara to her.

281. The documents Meador claimed to have in hand at the hearing but that he declined to furnish, would have confirmed Meador's perjury.

282. At the hearing, Max testified he had not sold the water rights awarded to Lauara.

283. Lauara testified the water rights were purchased from Max's disability account, which she stated was joint money because it was from Max's workers' compensation and disability money.

284. It was acknowledged that these water rights were paid for from account No. 978796522.

285. The Decree confirms that Max's payment to Heideman came from the same account.

286. The canceled check to Heideman confirms Heideman was paid from account No. 978796522.

287. On Audio Tape A furnished during discovery, Lauara, confirms that the water shares were purchased with Max's disability account and that the water shares were Max's sole property.

288. Lauara's initial Snyder Income and Assets report confirmed Max purchased the water rights with his disability settlement.

289. Lauara confirmed the other water rights bought during the marriage were purchased from the funds Max received from selling a premarital painting.

290. All the water rights were purchased with Max's separate funds. Lauara and Woodburn committed perjury and are responsible for returning the water shares ordered to be transferred to her.

291. The Order is a forgery

**Item H.**

292. The Order prepared by Meador stated: *He (Mr. Snyder) offered no relevant legal authority and failed to identify any facts that if true, would justify a bond in an amount less than the amount of the full judgment.*

293. This statement is false. Max cited NRS 20.037 twice as the statute that allowed Max to request a lower bond. This is a violation of NRS 205.090, NRS 199.210, and NRS 207.360(13),(27), and (28).

294. Meador stated Max was required to equalize the IRSs by paying Lauara $53,153.

295. This is fraud again as heretofore discussed.

296. The Order is a forgery.

**Item K.**

297. The Order drafted by Meador states: *Mr. Snyder did not deny any of the facts outlined by Ms. Lisk's counsel.*

298. Item G above confirms this is false.

299. This statement cannot be found anywhere on the transcripts. This is a violation of NRS 205.300, NRS 207.360(13), (27), and (28), and NRS 199.210.

300. The Order drafted by Meador states: *He admitted that he had not cooperated with the QDRO.* This statement is false and cannot be found on the transcripts.

301. The Order is a forgery.

302. At the time Max filed for his pension, Lauara signed an affidavit acknowledging she would not receive any of Max's disability Pension.

303. Max believes that Lauara has received more than $10,000 from his retirement account for which she is liable for reimbursing Max.

304. Meador requested the court transfer the couple's joint Nevada property to Lauara as a result of Max not cooperating with the QDRO.

305. Max confirmed that Lauara was not entitled to half his pension.

306. Although Max had provided a QDRO just days following the trial, the court ruled he had not and found Max in contempt.

307. Meador lied to the court. Max was timely in submitting the QDRO.

308. The court found Max in contempt for not cooperating with the QDRO and ordered the couple's joint Nevada property to be quitclaimed to Lauara. Meador violated NRS 205.300, NRS 207.360(13),(27), and (28).

309. As a result, Lauara's attorneys are responsible to repay Max over $10,000 for the

funds, Lauara has received from Max's California disability pension and half the sale price of the joint Nevada property.

310. *He* (Mr. Snyder) *admitted he transferred water rights that were awarded to Ms. Lisk to a third person.*

311. This statement is still false, for the second time.

312. *Mr. Snyder insisted the Decree is in error so, in fact he should not be obligated to comply with the Decree. He cited no authority for his position.*

313. This statement is false: the Decree was almost verbatim and derived from Meador's fraudulent Trial Statement.

314. The Order is a forgery.

**Item L.**

315. *Ms. Lisk's counsel presented a Wilfong affidavit regarding fees and costs Ms. Lisk incurred as a result of Mr. Snyder's contempt of court abusive litigation conduct and her efforts to enforce the Decree and to respond to Mr. Snyder's meritless Motions.*

316. Meador stated he had the affidavit with him. He offered it to the court but the judge declined it.

317. The affidavit was never provided to Max.

**Item 13.**

318. *If Mr. Snyder does not comply with his obligations of this Order within two weeks of March 31, 2021, a warrant will be issued for his arrest, and he will be incarcerated until he complies.*

319. Lauara and Meador drafted an Order to arrest Max if he did not comply with their forged Orders, fabricated evidence, perjury, and subornation of perjury.

320. *Fields v. Turner*, 147 N.Y. S2d 542 (Sup. Ct . 1955) (false information in an affidavit used to procure an arrest warrant subjects attorney to liability).

321. Lauara/Meador forged this Order, provided false information perjuring themselves, and suborning perjury.

322. They continued covering their violation of the TRO by paying the attorneys' and Woodburn's fees with Max's funds from Lauara's community property IRAs in violation of NRS 205.300, NRS 207.360(9), (10), (13), (27) and (28).

323. Once Lauara's larger IRA was depleted Meador forged an Order requiring Max to give Lauara $53,153 from his smaller IRA.

324. Then Lauara and the Defendants insisted on jailing Max to keep him from further exposing their crimes.

**D. Order on Motorhome.**

325. On May 5, 2021, an Order was drafted by Meador valuing the motorhome at $140,000. Meador drafted an Order, ordering Max to pay Lauara $70,000.

326. The Order was signed by someone other than Judge Estes, the judge in this case.

327. The $70,000.00 was added to the Utah foreign judgment in addition to the other judgments.

328. At trial, Lauara testified they paid around $140,000 for the vehicle.

329. This was more than the couple paid for the vehicle 6 years previously.

330. Lauara took the motorhome in November 2017, placed it in storage for two years where it was burglarized and vandalized, and refused to tell Max the location.

331. When Max discovered the motorhome was in the Las Vegas area, the insurer who knew its location from the police report, declined to tell Max, a co-owner, where it was because

of Lauara's instructions.

332. Lauara owed Max a fiduciary duty to reveal the location. She refused and instead filed a claim with the insurer for damages to the motorhome and instructed the insurer to not tell Max. The insurer declined to inform Max of the damages.

333. The Insurer declined to tell Max the location of the motorhome although Max was listed as the insured on the policy.

334. When Max located the motorhome, Meador, fought Max's efforts to have the motorhome moved from the storage facility for repairs, threatening to sue the storage facility if they allowed Max access to the vehicle.

335. Lauara and her attorneys continued to fight Max's efforts to have the motorhome repaired with Lauara testifying against Max on behalf of the insurer by furnishing the insurer with a false Declaration.

336. That Declaration resulted in Max not being able to have the insurer complete the repairs.

337. Lauara's Declaration contained false statements including 25. where she claims she did not believe the physical damage warranted pursuing a claim.

338. The insurer completed over $47,000 in repairs once Max was able to get the motorhome out of storage and to repair shops.

339. Lauara stated in 31. she never told anyone to not contact Max. The insurer's notes document that Lauara did instruct the insurer not to call Max. This is a violation of NRS 207.360(27) and (28).

340. Lauara did instruct the insurer not to call Max.

341. Lauara's attorneys aided and abetted Lauara's breach of her fiduciary duty to

Max.

342. The motorhome is still in need of thousands and thousands of dollars in repairs for which Lauara's attorneys are obligated by NRS 207.360(24-29) and NRS 199.210.

343. Lauara acknowledged Max was ordered to pay her $70,000 for her half of the motorhome and provided the insurer with negative information against Max.

344. Lauara also provided the insurer with the fact that Max was sanctioned $56,575 for wrongful conduct by the divorce court.

345. Max has confirmed above the sanction was a result of Lauara and her attorneys' lies to the court in violation of NRS 207.360(13), (27), and (28) and NRS 199.210.

346. At trial, Max confirmed the motorhome was worth significantly less than $140.000.

347. It was agreed that Max could sell the motorhome and split the proceeds.

348. Max's attorney instructed Max to sell the motorhome.

349 On September 9, 2020, Max sold the motorhome for $42,500.

350. Max notified his attorney on September 18, 2020.

353. The Decree ordered the couple to split whatever the motorhome was sold for.

352. Meador's new Order was filed eight months after Max sold the motorhome and notified his attorney and the court, violating the Decree and in violation of NRS 207.360(13), (27), and (28), and NRS 199.210.

353. This new Order is both a fraud and a forgery.

354. Lauara's attorneys aiding and abetting her resulted in Lauara obtaining a judgment for $97,500 more than the vehicle was worth.

355. Meador then filed an order with the court obligating Max for a false value.

356. As a result, the attorneys and Woodburn are liable to Max for $97,500.

**E. Order Regarding QDRO.**

357. Max was found in violation of a court order to cooperate with a QDRO when in fact Max provided a QDRO in August 2020, immediately following the trial.

358. Lauara signed an affidavit acknowledging she would not receive any of Max's disability pension when Max first applied for the pension in 2008.

359. Max believes that Lauara has received since trial more than $10,000 from his retirement account for which she is liable for reimbursing Max.

360. Max timely submitted the QDRO. Meador denied it and resubmitted an altered QDRO months later excluding the fact that Lauara had signed the affidavit. This violates NRS 205.090, NRS 199.210, and NRS 207.360(10), (13), (25), (26), and (28).

361. As a result of Lauara's attorneys aiding and abetting, they are responsible to repay Max above $10,000.

**F. Meador's Declaration.**

362. Meador falsified numerous statements in his Utah Declaration to have Lauara's Nevada judgment entered in Utah.

363. The false statements in Meador's Declaration are a violation of Utah Code 76-8-502, a second-degree felony.

364. One of the more blatantly false statements in Meador's Declaration is that Max sued Lauara's son, Adam Lisk, when he knew and there was substantial evidence confirming her son was judgment-proof.

365. In Lauara's divorce Deposition in Reno, Lauara testified that Adam intended on

repaying loans.

366. Meador and Lauara knew Adam never intended to repay.

367. Meador aided and abetted Lauara's fiduciary responsibility to tell Max that Adam would not be repaying the loans to Max. .

368. Max did not know until after he had sued Adam and Lauara that Lauara had put the loans in Adam's bankruptcies and that she had been secretly repaid by 2015.

369. Meador knowingly and substantially assisted Lauara in breaching her fiduciary duty to Max and violated NRS 205.300, NRS 207.360(9), (10), (13), and (26-28).

370. Meador was aware of his role in promoting the breach of duty and Meador's assistance significantly damaged Max.

371. Meador's Declaration was electronically signed by Utah attorney, Howell, of the Provo, Utah law firm, Fillmore Spencer LLC., and filed with the Utah Court on August 23, 2021. Howell was working on behalf of Defendant, Woodburn, and assisted in Meador's fraud, fabrication of evidence and forgery.

372. On September 10, 2021, Max filed Defendant's Response to Declaration of Shawn B. Meador… exposing the false statements by Meador.

373. Following reading Max's Response to Meador's Declaration and following Max's continuing arguments against the entry of the Nevada foreign judgment, Howell knew the foreign judgment was obtained by Meador's fraud. The foreign judgments from North Carolina were sent to Meador in Clark County District Court in Nevada. Meador knew Lauara had been repaid the loans. See Section V. Knowing the Loans to Adam were Repaid. Meador gave the Judgments to Howell who also knew the loans had been repaid and that Lauara had allowed Max to sue her in North Carolina knowing the loans were repaid. Lauara then countersued Max. Lauara then countersued

Max. Defendants are responsible to Max for all his expenditures in North Carolina.

374. In his representation of Lauara, Howell on behalf of Meador, and Lauara threatened a non-party falsely stating Max had sold his separate water shares, to that party, and that if that party did not return them, they would sue the party in the Sixth Judicial District Court in Utah, where that individual worked, and the entry of foreign judgment was being entered.

375. The threat by Howell illustrated that he conspired with and aided and abetted Lauara and her Nevada and North Carolina attorneys in trying to unlawfully obtain Max's separate property, in violation of Utah Code 76-2-202, NRS 205.300, and NRS 207.360(10).

376. The false statements in Meador's Declaration are too numerous to include in this Complaint. Howell knew Lauara had allowed Max to sue her in North Carolina knowing the loans to Lisk had been repaid to her in 2015.

377. Max filed a response with the Utah court exposing the numerous false statements in Meador's Declaration.

378. Filing a false legal document in Nevada is considered a forgery under NRS 205.090, and a class D felony under NRS 183.130. It requires the forger, (Meador), to pay the victim, (Max), restitution on top of a penalty. The statute of limitations is four years…NRS 171.080.

379. In Utah, it is a violation of Section 16-6a-114.

380. Meador/Woodburn owes Max full restitution for Meador's forgery.

## VII. EMBEZZLEMENT NRS 205.300, NRS 205.220 & NRS 207.360(25).

381. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 380. as though fully set forth herein.

382. By knowingly taking disbursements from Lauara's community property IRAs and the jointly owned MESA for legal fees, Meador, and Woodburn embezzled from Max in

violation of the TRO, NRS 205.300, NRS 205.220, NRS 207.360(25), and Nevada's racketeering statutes 207.400(i)(a) and (ii), NRS 207.520(9) and (10)… five-year statutes of limitations.

383. Meador and Woodburn tried to hide their criminal behavior thus enhancing it.

384. The total disbursements exceeded $100,000 making it a Class B felony under NRS 205.220.

385. Meador and Woodburn are liable for repayment to Max of the funds and penalties.

## VIII. <u>RECEIVING STOLEN PROPERTY, NRS 205.257, NRS 207.360(24) & (25).</u>

386. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 385. as though fully set forth herein.

387. By receiving disbursements from Lauara's community property IRAs and the jointly owned business of MESA, for their legal fees, Meador, and Woodburn embezzled from Max. They violate the TRO and NRS 205.272.

388. By possessing those disbursements in excess of $100,000, Meador, and Woodburn are in violation of NRS 205.275, a Class B Felony.

389. Meador and Woodburn are liable for repayment of those funds to Max, plus penalties.

## IX. <u>OFFERING FALSE EVIDENCE NRS 199.210, NRS 193.130 & NRS 207.360(28), AND FORGING AMENDED TAX RETURNS NRS 205.090 AND NRS 205.463</u>

390. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 389. as though fully set forth herein.

**False Claims that Max's First Three Attorneys had Conflicts of Interest.**

391. Max has clearly stated this claim and the explanation of Lauara, Meador, and Woodburn offering false evidence in section **IV** above to have Max's attorneys disqualified.

392. As a result of this false evidence, Max was damaged hundreds of thousands of dollars by Meador, and Woodburn for which they are responsible.

393. These actions violate NRS 207.360(28), and NRS 199.210 and are Class B felonies under NRS 193.130.

**Defendant's Fabricated and False Home Improvements to Max's Utah Home. Defendant's Trial Exhibit J.**

394. Meador's questioning sequence at trial instructed Lauara that the couple made $260,000 improvements to Max's Home and Lauara agreed the improvements were repairs. Repairs are not improvements.

395. Lauara and her attorneys provided no receipts. Lauara testified she totaled credit card charges.

396. The credit card charges included food, fuel, pet supplies, a trip to Russia, lodging, and raft frames... Defendant's Trial Exhibit J. It was never produced at trial.

397. Lauara testified after Meador entered in his Trial Statement, that the home improvements to Max's home totaled $260,000 yet the listing of false charges delivered with the Divorce Decree to Max totaled only $175,154; furthering their fraud.

398. The checks at the back of the Exhibit J were not bates numbered confirming they were not disclosed and added at a later date.

399. The $260,000 claimed by Lauara was fabricated by Meador and Lauara suborned Meador's fabrication agreeing to it at trial.

400. Lauara was awarded $130,000 for these fabricated improvements. This is NRCP & URCP Rule 60(b) fraud and violates NRS 205.300, NRS199.120, and Utah Code 76-2-202, a violation of NRS 207.400(i)(a) and (ii) NRS 207.520(9) & (10), and NRS 49.115…There is no privilege under NRS 49.095 or 49.105: 1. If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud. Meador, Kelley, and Woodburn knew Lauara had hired them to commit a crime and they followed through in aiding and abetting Lauara in committing crimes and fraud.

401. Lauara and Meador fabricated evidence that she and her Nevada attorneys knew was fabricated and entered it at trial.

402. Meador first fabricated this false evidence in his Trial Statement a violation of NRS 207.306(28) and NRS 199.210.

403. The false evidence from Meador's Trial Statement was transferred to the Divorce Decree.

404. Meador, Woodburn, Howell, and Filmore, aided and abetted Lauara's unlawful conduct.

**Lauara Fabricating Loans to Herself violating NRS 207.360(10), (27), & (28) and NRS 199.210.**

405. The report by Max's expert witness, Ms. Warren, at the divorce, Plaintiff's Exhibit 24, 126 pages long, was disallowed by the judge without the authority under NRS 50.275 to do

so and Ms. Warren was not allowed to testify.

406. A review of the document confirms it was professional.

407. It had 8 Exhibits with narratives of the documents contained in each. Exhibit 5's narrative of the report, section 5.7, revealed that Lauara appropriated money from Wendover Ambulance Service (WAS) and fabricated loans to herself with those funds.

408. A document prepared by Lauara showed $240,188 in loans Lauara claimed she made herself from company cash from 2004 through 2013.

409. Meador's Trial Statement falsely blamed Max for depositing the cash into the couple's joint account and that Lauara repeatedly asked Max to produce documents reflecting the source of the cash. This is a violation of NRS 199.210 and NRS 207.360(28).

410. An example of a fabricated loan by Lauara was the $11,000 loan Lauara claimed the company made to her is shown and confirmed that Lauara appropriated the money, then loaned it back to the company, not herself, on the same day; 10/19/2009.

411. The company QuickBooks confirms the company owed Lauara several different amounts including the $11,000, listed as company liabilities, not receivables.

412. There was not a single loan to Lauara from the company shown on the company's accounting, nor did Lauara produce any documentation to support her claims.

413. Lauara offered discounts to customers that paid in cash and/or wrote checks to her.

414. None of this money appeared on the company books. QuickBooks only showed the loans Lauara made the company from its cash.

415. The cash for the claimed loans to herself came from Lauara and Max being reimbursed for carrying the ambulance service on their credit cards.

416(a). Lauara's fabricated loans were meant to obligate Max to repay her half the loans, plus interest. The Divorce Decree ordered Max to cooperate in filing the amended tax returns. This verbiage came from Meador's Trial Statement and expected Max to repay these false loans and tax obligations. Max sent emails to Lauara and her attorneys, requesting amended and signed tax returns yet they continue to decline to produce the returns to Max for his review. Max recently discovered the amended returns were submitted with his signature forged, when he subpoenaed the Nevada company accountant.

416(b). Max tried to cooperate with Lauara and the IRS concerning the loans Lauara claimed to have made herself. On January 5, 2021, Max sent an email to Lauara and Meador stating he had contacted the IRS to work with them and invited Lauara her accountant and their enrolled agent to work with him. On the same day, Meador responded with an email confirming they were working with the enrolled agent; that the Decree required Max to sign the amended returns and not call the IRS, and that they were waiting for Max to sign the amended returns. When Max declined to sign the amended returns, Max's name was forged to them in violation of NRS 205.090, NRS 205.463, and NRS 207.360.

416(c). Defendants Meador, Kelly, Wells, and Woodburn knew Max's name had been forged to the amended returns when they filed the Motion to Reduce Sums to Judgment on December 23, 2021. Defendants aided and abetted Lauara in forging Max's name to the amended returns. This is a violation of NRS 205.090 NRS 205.463 and NTS 207.360(13) by all parties. Max filed an identity theft complaint with the IRS.

416(d) In Lauara's Counterclaim filed with the Fourth Judicial District Court in Elko, Nevada, on January 11, 2018, and at trial, Lauara claimed she had been a resident of

Nevada for six weeks prior to signing her Counterclaim. Lauara maintained that both she and Max were Utah residents up until her departure on November 2017. Lauara filed no tax returns with the state of Utah when she filed her amended Federal returns. Lauara filed her amended returns as a Nevada resident. Lauara was only interested in filing the amended tax returns to extort hundreds of thousands of dollars from Max for repayment of her fabricated loans. This violates NRS 205.090 and NRS 205.463. Lauara's attorneys and accountant aided and abetted the filing of these false tax returns.

416(e) On October 26, 2022, Lauara sent a letter to a Utah district court judge attempting to destroy Max's case against his former attorney and to have her accountant, Scott Brand, found not in contempt of court for declining to respond fully to a subpoena concerning the couple's amended tax returns stating false information including that Max could get the amended tax information from his former attorney. The amended returns were done post-divorce. Max's divorce attorney, Aaron Bushur (Bushur), filed a Motion to Withdraw on September 19, 2020, eight days following the entry of the decree and did not have this information.

416(f) The IRS has no record of Lauara amending the couple's 2004-2013 tax returns for the years she claimed to have lent money to herself and the court ordered Max to cooperate in filing amended returns.

416(g) Schedule E, Supplemental Income and Loss of the amended 2015 and 2016 returns filed by Lauara showed that both Mesa Business Complex (MESA) at 427 Mesa Street and the Wendover home at 637 Mesa Street were community-owned rental properties. The documents, with Max's name forged to them, were prepared never intending to allow Max to see them, intentionally violating NRS 205.090 and NRS 205.463.

416(h) In amending the joint tax returns Lauara forged Max's name to the returns in 2015 and 2015 in violation of NRS 205.463. The IRS rejected the returns and sent Lauara's money back to her. The company accountant, Scott Brand, prepared the tax returns without Max's knowledge or input and mailed them to Lauara in Wendover, Nevada. Mr. Brand instructed Lauara that both she and Max had to sign the returns. In filing the amending joint tax returns, Lauara forged Max's name on the returns in violation of NRS 205.090, NRS 205.463 and NRS 207.360. The IRS rejected the returns and sent Lauara's money back except for 2015 and perhaps 2016.

416(i) For the 2015 amended taxes, Lauara paid the IRS $3,275. This is the total amount confirmed by the accountant Lauara paid the IRS that was not refunded. *See* 416(a) through 416(c) above. Even this amount was fraudulent. Lauara's September 22, 2022 Motion to Reduce Sums to a Judgment confirmed that Lauara claimed she sent the IRS $28,498. Lauara verified this with her attached affidavit even though the money had been returned to Lauara. This is NRCP Rule 60(b)(3) fraud and violates NRS 205.090, NRS 205.463, NRS 207.360(13), and 205.300. The pleading is fraudulent and a forgery by Lauara. Lauara was aided and abetted in this by the Defendants. Defendants were also accomplices as provided by NS 195.030

416(j) The Order from the Nevada Court of Appeals acknowledged these loans. The Court notes these loans were "cash transfers from the businesses to the parties' joint accounts." These notes from 2004 through 2013 claimed to have amended never were Lauara, her accountant, and her attorneys added and forged Max's name to the 2015 and 2016 amended tax returns to obligate and in doing so confirmed Mesa Business Complex and the Nevada home were community property. This is fraud on the court a violation of NRCP Rule 60(b0(3). Lauara's attorneys aided and abetted Lauara in violation of NRS 195.020 and NRS 195.030.

416(k) Just as Max was getting ready to submit this Complaint, he received a questionable Order drafted by Howell purported to be the ruling from the Nevada Court of Appeals on Max's appeal. The judgment against Max was reduced to $129,407. Howell and the other attorneys were not pleased and pledged to have it increased through the district court. This increase would be from the hundreds of thousands of dollars in fabricated loans, addressed above, that Lauara claimed to have made herself. All Lauara's attorneys are aware the loans were fabricated. Therefore, Max will retain the original amounts in this complaint.

416(l). The Order referenced in 416(k) above is the result of Lauara's Nevada attorneys unlawfully reducing the original divorce decree to a judgment at a November 10, 2020 hearing while the case was on appeal with the Nevada Supreme Court.

417. As ordered in the Decree, and objected to by Meador, Max worked with the IRS which determined the loans did not exist. Meador, Kelley, Woodburn, Howell, and Fillmore aided and abetted Lauara in fabricating evidence. Max made repeated requests of Lauara and her attorneys to provide him with Lauara's "signed" amended tax returns including the couple's 2004-2014, 2015, and 2016 joint returns, and the couple's regular tax returns. They declined to produce any returns. Meador drafted a reply to Max's request that the returns had been provided to Max's divorce attorney knowing that was false and included Max's former attorney, Justin Heideman. The copy to Heideman, and the other documents they shared, were made to damage Max's on-going suit against Heideman.

**Poison Allegations.**

418. Max filed complaints with the Sevier County Sheriff's Office alleging Lauara had tried to poison him on several occasions.

419. The Sheriff's Office botched, or buried, the initial report and then falsely claimed

Max had eaten the same food prepared by Lauara several times, becoming sick each time.

420. At a TRO hearing in Wendover, Nevada, Lauara testified that Max had been sick on several occasions, in the last few months they were together and that was the basis for Max's allegations about being poisoned.

421. Lauara testified the occasions were in Canada, Montana, on a cruise, and at home.

422. Lauara entered the false police reports at trial as her Exhibit O, knowing they were false.

423. Max had poison tests completed which confirmed Max had been poisoned.

424. At Max's deposition, Meador confirmed the chemical in the test results was used in erectile dysfunction medications and blamed the chemical in the poison test on Max's use of those medications.

425. Max informed Meador he had a penis pump and did not require the medications.

426. The Decree states that Max attempted to gain an advantage by filing police reports "espousing superiors' accusations" against Lauara.

427. Lauara used a false police report at trial claiming Max filed a tawdry Match.com profile of her and then mailed it to her granddaughter in North Carolina. Lauara's police report confirmed the profile sent to her granddaughter was mailed from North Carolina where her granddaughter and other family members lived.

428. Max did not know people in North Carolina outside of Lauara's family and friends.

429. Meador, and Woodburn knowing used false evidence at trial to discredit Max in their aiding and abetting Lauara, in violation of NRS 199.210 and NRS 207.360(27) and (28).

## X. CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT

430. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 429. as though fully set forth herein.

**Hiding Joint Bank Statements.**

> L]iability attaches for civil aiding and abetting if the **Defendant substantially assists** or **encourages** another's conduct in **breaching a** duty to a third person. DowChemical Co. v. Mahlum, 114 Nev. 1468, 970 P.2d 98, 113 (1998). [Paraphrased] Plaintiffs must prove three elements to show Defendant A aided and abetted Defendant B: **That Defendant B breached a duty to Plaintiff**, the result of which injured Plaintiff; That Defendant A knowingly and substantially assisted Defendant B in breaching the duty, and That Defendant A aware of its role in promoting the breach of duty at the time it provided assistance. The jury found in favor of **Dow Chemical** on the claim of conspiracy to commit fraudulent misrepresentation.

**Woodburn played and is aware of its role in its breach and hiding of bank statements.**

431. Max retired at the end of December 2007 and moved to Wendover, Nevada, for several months with Lauara.

432. During this period Max oversaw the remolding of the business properties in Wendover.

433. The remodeling was paid for from the couple's joint personal account.

434. Lauara had taken all the bank information when she left in 2017 to hide this fact, in addition to other community funds she had diverted for her use.

435. Meador and Lauara refused to disclose the 2008 and earlier bank statements for trial to prevent Max from claiming an interest in the Nevada businesses he paid to remodel.

> Fiduciary relationship gives rise to a duty of disclosure, breach of which will support claim of fraudulent concealment… Nondisclosure will become the equivalent of fraudulent concealment when it becomes duty of a person to speak in order that party with whom he is dealing may be placed on an equal footing with him. *Dow Chemical v. Malhum.*

436. (1) Lauara's attorneys aided and abetted Lauara in hiding the 2008 and prior joint bank statements. (2) Lauara breached her fiduciary duty to Max by removing the bank statements from the Utah home and refusing to provide them to Max during discovery. This substantially harmed Max resulting in the loss of his interest in the Nevada businesses. (3) Lauara's attorneys were aware of their role in promoting fraudulent concealment and the breach of Laura's fiduciary duty to Max.

437. NRS 125.020(2) states:

> *Unless the cause of action accrued within the county while the plaintiff and Defendant were actually domiciled therein, no court has jurisdiction to grant a divorce unless either the plaintiff or Defendant has been resident of the State for a period of not less than 6 weeks preceding the commencement of the action.*

438. In 2008 Max lived with Lauara in Elko County Nevada for more than 6 weeks during which time a cause of action occurred.

439. Lauara's attorneys knew that Max qualified under NRS 125.020(2) to file for divorce in Nevada.

440. The false claim was transferred from the Trial Statement to the Decree.

441. Lauara's attorneys claimed at trial Max was not a resident qualified to file for divorce thus aiding and abetting Lauara in destroying Max's credibility. The Court illegally commenced the divorce from Lauara's response and counter-claim and made her the plaintiff in the case.

**Hiding the Couple's Loans to Adam Lisk in His Bankruptcies. NRS 207.360(9).**

442. Lauara secretly allowed Adam to place Max and her loans to Adam in his bankruptcy, breaching her fiduciary duty to Max. *See* above, **IV HAVING MAX'S ATTORNEYS DISMISSED FOR NON-EXISTENT CONFLICTS OF INTEREST.** above

443. Lauara's attorneys aided and abetted Lauara's covering up her fraudulent management of the couple's loans to her son and the status of the loans as they pertained to the divorce proceedings. This is a violation of NRS 195.020, NRS 195.030, NRS 207,360, (9), (26), and (23), a five-year statute of limitations.

**Hiding that Lauara was Repaid the Loans to Adam, NRS 195.020, NRS 195.030, and NRS 207.360, (9).**

444. Lisk secretly repaid Lauara the loans made to him by Max and Lauara through the resolution of his bankruptcies. Lauara had secretly allowed Lisk to put in his LLC bankruptcies. *See* **IV HAVING MAX'S ATTORNEYS DISMISSED FOR NON-EXISTENT CONFLICTS OF INTEREST** above.

445. This is a violation of NRC 207,360, (9), (26), and (23), a five-year statute of limitation.

446. Lauara's attorneys aided and abetted Lauara in her fraudulent concealment and in breaching her fiduciary breach to Max in violation of NRS 104.3307, NRS 195.020 and NRS 195.030.

> To establish a prima facie case of fraudulent concealment, a plaintiff must offer proof that satisfies five elements: (1) the Defendant concealed or suppressed a material fact; (2) the Defendant was under a duty to disclose the fact to the plaintiff; (3) the Defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; that is, the Defendant concealed or suppressed the fact for the purpose of inducing the plaintiff to act differently than she would have if she had known the fact; (4) the plaintiff was unaware of the fact and would have acted differently if she had known of the concealed or suppressed fact; (5) and, as a result of the concealment or suppression of the fact, the plaintiff sustained damages, *Nevada Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1415 (D. Nev. 1995).

447. (1) Defendants concealed from Max the fact that the loans to Adam had been placed in Lisk's bankruptcies and later repaid to Lauara; (2) the Defendants had a fiduciary duty to disclose to Max that the loans that had been placed in the bankruptcies; (3) the Defendants

intentionally concealed the fact with the intent to defraud Max and induce Max to act differently than he would if he knew the fact; (4) Max was unaware of the fact and would have acted differently if had known those concealed facts. Knowing the loans had been repaid to Lauara, Max would not have sued Lauara, Adam, and Ryan in North Carolina; (5) as a result of the concealment of the fact and Max suing the parties, Max sustained substantial attorney fees and judgments against him. In addition, the concealment by the Defendants resulted in Max's attorneys being removed for nonexistent conflicts causing Max additional attorney fees, and Max losing his share of the return on the loans.

448. These are all 6-year statute of limitations under NRS 11.190(a) and a 5-year under NRS 207.400, 27 perjury and subornation of perjury, and 28 offering false evidence.

## XI. FABRICATING EVIDENCE, OFFERING FALSE EVIDENCE, NRS 199.210 and NRS 207.360(28).

449. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 448. as though fully set forth herein.

450. Lauara and her attorneys petitioned the court to be allowed to file the Trial Statement.

451. With the Trial Statement, Lauara entered into the record false evidence without objection, confirmed above and below in violation of NRS 199.210 and NRS 207.360(28).

452. The judge verbally declined at trial to review the trial record or documents for his decision relying instead on Lauara's Trial Statement.

453. Lauara's Trial Statement was, as stated by the judge on Day Four, of his recital of the pending Order.

454. The offering of false evidence is a violation of NRS 199.210 and NRS.

207.360(28). Aside from the references above in which Lauara's Trial Statement was used to prepare the Divorce Decree, the Decree further stated the following false evidence from Lauara's Trial Statement.

a. 5. Max violated the rules of Discovery. Max was sanctioned for his attorney not responding to the motion for sanctions.

b. 5. Max Violated the court's order not to share an attorney cited herein above.

c. c. Plaintiff's testimony was vague, evasive…

d. e. Plaintiff alleged Defendant stole documents but provided no evidence… This is false. The couple's 2008 and prior financial records had been requested from Defendants during discovery, at Max's deposition, and trail. Lauara and Meador hid and refused to disclose the couple's 2008 bank and earlier account had been requested from Defendant, information. Lauara is the one in violation of 16.2 for refusing to disclose documents.

e. f. Plaintiff attempted to gain an advantage…filing police reports espousing spurious accusations against Defendant. This has been disproven above. *See* **Poison Allegations**, 432-443 above.

f. g. Plaintiff is found to be in contempt for paying Justin Heideman Esq. $150,000 in community funds in violation of this Court's Orders. There was no court order for this and the $150,000 was Max's separate disability funds from a separate account. Plaintiff's actions…have constituted waste of community estate, especially concerning the frivolous North Carolina lawsuit… Meador also claimed Max refused to drop the lawsuit against Lauara. Max dropped

Lauara from the suit prior to Lauara answering the complaint. In addition, Lauara allowed Max to sue knowing she had been secretly repaid the loans that Max was suing to recoup. *See* **V. KNOWING THE LOANS TO ADAM WERE REPAID & HAVING MAX'S ATTORNEYS DISMISSED FOR NON-EXISTENT CONFLICTS OF INTEREST IN VIOLATION OF NRS 207.360(28)** above.

g. 17. Lauara stated the $218,127.93 Max placed in his separate account was community funds from Max's workers' compensation, and Lauara and her attorneys cited this as their support for Lauara being awarded an unequal share of the community estate. They insisted this was a breach of Max's fiduciary duty to Lauara. These were not community funds as confirmed above in 137-141 and Lauara's testimony at trial, *see* h. below.

h. At trial, Lauara testified that Max was disabled not on workers' compensation, on a disability, and not required to return to work. This is a disability and not workers' compensation.

## XII. FRAUD ON THE COURT; RULE 60(b) and 60(b)(3) FRAUD ON THE COURT

455. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 454. as though fully set forth herein.

456. The Defendants' actions of fabricating evidence and forging orders violated the integrity of the court. A claim based upon fraud on the court under Rule 60(b)(3) is intended "to protect the integrity of the judicial process" and, therefore, is not time-barred. Bowie v. Maddox, 677 F. Supp. 2d 276, 278 (D.D.C. 2010)

457. On September 22, 2022, Kelly filed a Motion to Reduce Outstanding Sums to Judgments. Kelly knew these sums were obtained under URCP Rule 60(b)(3) fraud, by fabricating evidence and drafting false orders and the case would most likely be dismissed because of their fraud, among other things, of stating Lauara was a Nevada Resident at the commencement of the divorce. The resident claim allowed Lauara to steal Max's assets. Lauara previously made the same motion of reducing Sums to Judgments on November 10, 2020. Lauara *cited Mack-Manley v. Manley* as the Nevada Supreme Court ruling allowing the reducing Sums to Judgments. Lauara and Meador cited *Mack-Manley v. Manley* as the justification by the Nevada Supreme Court that, "The trial court, however, retains jurisdiction to enter orders on matters that are collateral to and independent from the appealed order." In this citing, Lauara declined to acknowledge that the *Manley* court was quoting another Supreme Court ruling, *Bongiovi v. Bongiovi* 579 P.2d 1246 (1978) which stated:

> 2. We also reject the contention that the district court had no jurisdiction to grant the requested relief because of a pending appeal in the case. This matter was entirely collateral to and independent from that part of the case taken up by appeal, and in no way affected the merits of the appeal. See Osborn v. Riley, 331 So. 2d 268 (Ala. 1976); Dear v. Locke, 128 Ill. App.2d 356, 262 N.E.2d 27 (1970); cf. East Standard M. Co. v. Devine, 59 Nev. 134, 81 P.2d 1068 (1938). As noted, we deem briefing by respondent unnecessary and oral argument unwarranted. Under these circumstances, we deny respondent's motion for an attorney's fee to contest the appeal. Accordingly, this appeal shall stand submitted, and, in the absence of reversible error, we ORDER this appeal dismissed.

Unlike *Bongiovi v. Bongiovi*, Max appealed the attorney fees awarded Lauara because they were paid from Lauara's IRAs which were community property and belonging to both Max and Lauara. Max had already paid Meador's attorney fees. In this case the attorney fees were not a collateral matter. The Nevada Court of Appeals recognized Max appealed this issue and stated so on pages 26-27 of its Order on Max's appeal. This matter was not "collateral to nor

independent from that part of the case taken up by appeal." Meador knew it was improper and affected the merits of Max's appeal and was a fraud on the court when he brought the motions to each Order to Show Cause Hearing. Both Order to Show Cause Hearings were unwarranted and the Orders coming from each hearing, which are the basis for Lauara's foreign judgment against Max, are not allowed and thus are void.

458. Unlike these appeals cited by Lauara which were dismissed because the briefing was not necessary, the Nevada Court of Appeals Ordered a Full Briefing of all documents on Max's appeals. The case is to be determined on all the pleadings which came from the Nevada Supreme Court. The purpose of this September 22, 2022, Motion is obvious. Prior to the Divorce Decree being dismissed, Lauara will lien and sell all of Max's properties. Then, like Lauara's son did with the loans Max made him, Lauara will take out bankruptcy and steal all of Max's assets. Defendants Meador, Kelly, Woodburn, and Howell are aware of this strategy.

459. Defendant Kelly stated in her Motion to Reduce Outstanding Sums to Judgment and citing *Mack Manley v Manley*; *"absent entry of a stay upon posting of an appropriate bond, this court has jurisdiction over Ms. Lisk's contempt motions."* Meador set the bond at $715,478. This was after Max confirmed that the court could set bond at a lower and appropriate amount under NRS 20.037; that Meador had allowed Lauara to pay his fees with her community property IRAs; and that Max had not sold the water rights awarded Lauara;

460. Following Max stating the statute allowing the court to set a reduced bond, Meador falsely stated Max could not cite facts or law to support his position.

461. The bond should have been eliminated or set at a reduced amount. Because of Meador's actions and perjury, the bond was inappropriate as was the court's action of reducing

the Outstanding Sums to Judgment. They are inappropriate with Meador and Kelly's second attempt as well.

462. The Motion to Reduce Outstanding Sums to Judgment signed by Kelly is a simple rehash of the March 31, 2021 hearing and the order drafted by Meador.

463. The Motion to Reduce… furnished by Kelly on September 22, 2022, states that Max transferred all but eight shares of water that the court awarded Lauara to Mr. Milt Vanderlinde. The Order drafted by Meador, following the March 31, 2021, Hearing states, "Mr. Snyder transferred water rights awarded to Ms. Lisk (Lauara) to his friend." At the hearing on March 31, 2021, Meador stated, "Mr. Snyder transferred all the water rights awarded to Lauara to his good buddy. Mr. Vanderlinde."

464. At the March 31, 2021, Hearing Meador stated he had a letter from Max's water company that he could show the court confirming Max had transferred the water shares awarded to Lauara to his friend. He declined to produce the letter to the court or Max. It needs to be noted that the Motion to Reduce… Kelly furnished to the court on September 22, 2022, stated that at most Max may have transferred one-half of one share awarded to Lauara. In this statement, Meador and Kelly admit that Meador provided perjured testimony and fabricated evidence at the March 31, 2021, Hearing and that with that false evidence, Rule 60(b)(3) fraud on the court, they obtained an unfair bond and an unjust Order drafted by Meador. A review of paragraphs 291-341 above confirms that Meador perjured himself several times and entered fabricated evidence into the Hearing and the Order he prepared in violation of Rule 60(b)(3), NRS 205.300, NRS 205.090, and NRS 207.306(9), (10), (13), (24), (25), (26), (27), (28).

465. It should be noted that Meador had Howell go after all of Max's water shares which totaled over 30 shares and had Howell threaten Mr. Vanderlinde with suing him if he did

relinquish the shares to Howell. This violates Rule 60(b), NRS 205.300, and NRS 207.360(9), (10), (27), and (28).

466. The *Mack-Manley* Nevada Supreme Court ruled:

> As a properly filed notice of appeal vests jurisdiction in this court, the district court is divested of jurisdiction to consider any issues that are pending before this court on appeal.

467. Max properly appealed the March 31, 2021 Hearing and its order which was entered as Nevada Supreme Court case 82756. That included every issue of that hearing. It should be noted that attorney Wells, of Woodburn, is noted as a respondent. The second Request to Reduce the Sum to a Judgment was also brought in bad faith by Kelly, knowing the bond amounts were derived by fraud on the court and perjury and that the Mack Manley case she cited did not allow the change of the Sum to a Judgment. Kelly, in preparing and signing this Pleading is covering Meador's perjury and fabrication of evidence at the March 31, 2021, Hearing.

468. The November 10, 2020 Order to Show Cause Hearing covered the same issues as the March 31, 2021 Order to Show Cause Hearing except that Max was not allowed to attend the November 10, 2020 Hearing. *See* paragraphs 274-290 above.

469. At the November 10, 2020 Order to Show Cause Hearing, Judge Estes stated the Supreme Court had ordered a review of the complete record and that it divested the district court in anything but collateral matters.

470. Meador stated at the Hearing: "…*this court retains jurisdiction to enforce its orders and retains jurisdiction over matters that are collateral independent of the order appealed from...*" Meador went on to say: "*Right now Ms. Snyder is going to get paid out of the equity in Mr. Snyder's property… He's listed his home for sale*… *And if it doesn't,* (referring to that if the Court did not reduce the Sum to a Judgment), *my client will be out hundreds of*

*thousands of dollars in legal fees.*" Meador's real concern was his pocketbook. Meador cited *Foster v Dingwall* and *Klabcaka v. Nelson* as the cases that would allow the court to collaterally change the Sum to a Judgment. *Klabcaka* citing *Foster* stated:

> The district court can enforce an order that is pending on appeal and retains jurisdiction over matters that are collateral and independent from the order appealed, such as attorney fees. *See Foster v. Dingwall* , *126 Nev. 49, 52*, *228 P.3d 453, 455* (2010).

471. Max had appealed and contested the judgment awards including attorney fees that were paid from Lauara's community property IRAs, his money, and jurisdiction making this argument improper for altering the original orders judgments. The cases cited by Meador did not qualify. . *See* paragraphs 86-95 above. This was Rule 60(b)(3) fraud on the court by Meador, and at a minimum an NRCP Rule 60(b)(1) breach by the district court.

472. Meador continued: …" the simple solution … is to enter an order reducing the money he currently owes under the decree of judgment and enter an order that says his pro per pleadings filed before two minutes ago are disregarded." Meador was referring to the Order Regarding Improperly filed Documents he, filed with the district court at the 11/10/20 that Max was not allowed to attend. The Order disallowed all of Max's post-trial pleadings. Meador's Order claims it is supported by 4JDCR Rule 13. This violated 4JDCR Rule 13(2)(b) and **(c).** Max's attorney, Bushur, had filed a request for Withdrawal with the court on September 19, 2020, that was entered by the district court on September 25, 2020. It met all the requirements of 4JDCR Rule 13 and Supreme Court Documents allowing Max to file his pleadings. This amounts to forging an order by Meador and the court under NRS 205.090. Meador's Rule 60(b)(3) fraud on the court got Max sanctioned and ordered to pay the cost of Lauara's attorney

fees to respond to Max's post-trial pleadings. Meador had the judge order that Max quitclaim the couple's Wendover property to Lauara for this abuse. Lauara sold the property for $125,000, costing Max $62,500. ;

473. Judge Estes questioned that since Mr. Snyder was not there and not able to argue…against reducing the order to a judgment they could not do so. Meador perjured himself and stated that Max had notice of the hearing and Max chose not to attend so Max's due process is not denied. This is false. *See* paragraphs 274-290 above.

474. Judge Estes entered the Order Meador had pre-prepared and had in hand, reducing the sums to a judgment, of $358,000+, violating Max's due process and in violation of the Nevada Supreme Court's order in Mack Manley v. Manley.

475. This fraud on the court worked so well for Meador and Kelly, they went to district court three times raising the judgment each time, beginning with $358,000 and ending with $715,478 plus $70,000 for the motorhome; (Meador drafted a separate Order and had the court quitclaim the couple's Florence Street, Nevada property to Lauara to cover the motorhome sale) plus $28,498 for the purported taxes on the loans Lauara claimed to have made to herself. Lauara hid this from Max, and the amount was considerably less. The IRS rejected these loans and returned the funds. This is Rule 60(b)(3) fraud on the court, NRS 205.090 forgery of a Court Order and NRS 205.300 extortion. Lauara had forged Max's name to their amended returns in violation of NRS 205.463 and NRS 207.360(13). The Defendants also raised the judgments for 1) plus, five vehicles; 2) $56,575 in post-Decree litigation conduct, for Meador's false claim that Max filed pleadings without an attorney in violation of the rules (All of Max's pleadings were allowed under 4JDCR Rule 13(2)(b) and (c)),; and the $28,000 in taxes Lauara purportedly paid the IRS on her amendments to her and Max's joint tax returns. Lauara had to forge Max's name

to their amended returns in violation of NRS 205.463 and NRS 207.360(13). With the Motion by Meador and Kelly, Lauara was awarded the $70,000 for the motorhome twice, once in the quitclaim and again with the Motion to Reduce... With all this fraud on the court, Meador and Kelly nearly tripled the original Sum Reduced to Judgment.

476. Over time the interpretation and enforcement of fraud and fraud on the court and more specifically Rule 60(b) fraud on the court, by an officer of the court or his client, has softened. Even under the older more stringent interpretation, the Defendants actions constitute fraud on the court

> Before 1980 only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court. See Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S. Ct. 997, 88 L. Ed. 1250 (1944); Root Refin. Co. v. Universal Oil Products, 169 F.2d 514 (3d Cir. 1948); 7 J. W. Moore, Federal Practice, para. 60.33 at 510-11. Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it will not ordinarily rise to the level of fraud on the court. See Kupferman v. Consolidated Research & Mfg. Co., 459 F.2d 1072 (2d Cir. 1972); see also England v. Doyle, 281 F.2d 304, 310 (9th Cir. 1960).

477. The Defendants' fraud and fraud on the court, that of offering false evidence as described above and in V. KNOWING THE LOANS TO ADAM WERE REPAID & HAVING MAX'S ATTORNEYS DISMISSED FOR NON-EXISTENT CONFLICTS OF INTEREST IN VIOLATION OF NRS 207.360(28), is a fabrication of evidence, severe misconduct warranting the term of Rule 60(b) fraud on the court and harsh consequences.

478. Claim VI. FORGING ORDERS A VIOLATION OF NRS 205.090 and NRS 207.360(13) stated above alleged above implicates the attorney, Meador, an officer of the court who fabricated evidence and transferred it to the orders he drafted. These included that Max refused to cooperate with the QDRO;

479. Claim IX. OFFERING FALSE EVIDENCE NRS 199.210 and NRS 193.130 stated above where Defendants had Max's attorneys disqualified for false allegations and fabricated evidence and testimony that the $260,000 in home improvements they claimed were made to Max's Utah home and received a $130,000 judgment against Max for the fabrication fits the most egregious misconduct described above.

480. The loans Lauara and her attorneys claimed she made herself then refused to allow Max's expert witness to testify and expose them as fabricated, fits the most egregious misconduct described above.

481. Falsely stating Max's disability was workers' compensation and then being awarded over half, fits the most egregious misconduct described above.

482. Entering into trial evidence the Sheriff's Office's botched investigation of Max's alleged poisoning by Lauara, when Lauara's previous testimony contradicted the hearsay police report she introduced into evidence is another of the most egregious misconduct described above.

483. Claiming the loans the couple made Lauara's son, were still owed and that her son intended to repay the couple when Lauara had been secretly repaid the loans, then having Max awarded the loans is another of the most egregious misconduct described above.

484. The cause is stated in claim XI. FABRICATING EVIDENCE, OFFERING FALSE EVIDENCE, NRS 207.360(28) references the Trial Statement drafted by Meador with fabricated evidence that he then used to draft the Divorce Decree fits the most egregious misconduct described above.

485. The Nevada courts have since softened in interpreting Rule 60(b) fraud on the court. The six-month URCP Rule 60 fraud on the court limitation will not bar a motion to set

aside the property distribution where fraud was committed upon the court. *See* Murphy v. Murphy, 103 Nev. 185, 186, 734 P.2d 738, 739 (1987).

486. However, Max did file Rule 60(b) fraud motions within six months and is covered by both the Rule and the *Murphy* court decision.

487. The Nevada Supreme Court ruled in *Blanchard v. Blanchard*, in which the wife filed an independent contract action alleging fraud against the husband about 90 days after their divorce, seeking rescission based on her assertion that certain assets listed in the parties' property settlement agreement as going to her did not exist at all, certain others were worthless, and others going to the husband were undervalued; the Husband had claimed that certain assets he received were worthless, but later sold them at a profit. While the case did not cite NRCP 60(b), much of the reasoning was similar to the cases explicitly decided under that rule. The valuations of the assets had been fixed by the husband and relied on by the wife. The wife filed suit on the basis of intentional misrepresentations. Reversing the lower court's granting of the husband's motion to dismiss pursuant to NRCP 12(b)(5), the Court found that even though the agreement contained a provision that the parties had not relied upon the values provided in the financial statement, neither that provision nor the agreement's "integration" or "waiver" clauses could bar a claim for intentional misrepresentation.

The Nevada Supreme Court ruled in *Manville v. Manville*, 387 P.2d 661 (1963):

> NRCP 60(b) provides in part: "This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court."
>
> The purpose of this part of the rule is to afford relief…, and the said six months' limitation has no application.

> *NC-DSH, Inc. v. Garner*, 125 Nev. Adv. Op. No. 50 (October 29, 2009), NV Sup. Ct. NRCP 60(b)(3) impose time constraints on parties who seek a motion or independent action to vacate a judgment because of fraud upon the court. A lawyer who commits fraud upon the court is not acting within the agency relationship he established with a client, and such fraud warrants setting aside a judgment under NRCP 60(b).

488. As in *Blanchard*, Max was awarded worthless properties the Defendants knew did not exist. Max's request for a default Judgment, in this case, against the Defendants, for fraud on the court, is warranted:

Just as Lauara's attorneys have done, in *Estate of Adams v. Fallini*, the estate's counsel "created a false record and presented that record to the district court as the basis for judgment." 132 Nev. 814, 819–20, 386 P.3d 621, 625 (2016). The district court had been deceived—or defrauded—into entering a judgment that, unbeknownst to the court, was based on a false premise that was overturned by the Nevada Supreme Court.

> *See, e.g., Link v. Wabash Railroad Co.*, 370 U.S. 626, 630–632 (1962). *See also Aoude*, 892 F.2d at 1118; *McDowell v. Seaboard Farms of Athens, Inc.*, 1996 WL 684140, 2-3 (M.D. Fla. 1996) (cases cited therein); *Sun World, Inc. v. Lizarazu Olivarria*, 144 F.R.D. 384, 389 (E.D. Cal. 1992) (holding that, when a litigant commits a fraud upon the court, "the inherent powers of the court support the sanction of dismissal and entry of default judgment"); *Pope*, 138 F.R.D. at 682 (dishonest conduct by a party or conduct that "threatens the integrity of the judicial process" is grounds for dismissal with prejudice under Rule 41(b)); *Amway Corp. v. Shapiro Express Co.*, 102 F.R.D. 564, 569–70 (S.D.N.Y. 1984); *Cox v. Burke*, 706 So. 2d 43 (Fla. 5th DCA 1998); *Kornblum v. Schneider*, 609 So. 2d 138 (Fla. 4th DCA 1992).

489. This Court should order an investigation into the fraud committed by the Respondent, her attorneys, and the attorneys' firms.

490. When the Nevada judgment obtained by fraud on the court was brought to Utah with a request to enter the judgment to obtain liens on Max's Utah properties and bank accounts, Max objected and filed several pleadings exposing the fraud, and the fraud on the court by

Lauara and her Nevada Attorneys. Lauara's Utah attorney, Howell, was made aware of the fraud and the fraudulent Decree and pushed the fraud on the Utah court. For his fraud on the court, Howell and his firm, are as culpable as the Nevada attorneys.

491. In Cause **III.** of this Complaint, Aiding and Abetting a Breach of Fiduciary Responsibility, included above, the divorce court ordered Lauara to close the couple's jointly owned business, Professional Services and Consulting, sell the assets, and split the proceeds with Max. Instead, Lauara opened a new business, Mesa Business Services, and began moving accounts to it from Professional Services and Consulting. When finished, Lauara closed Professional Services and Consulting, retained the assets, and continued in business.

492. Max made several requests for the accounting documents of the jointly owned company. All requests were refused by Lauara and the couple's accountant, Scott Brand (Scott). Max filed subpoenas and served Scott to obtain the information. Howell filed a Motion to Quash Max's subpoenas with the Sixth District Court in Sevier County Utah. No requested information was ever supplied to Max.

493. To keep Max from opposing the subpoenas, Howell hid his Motion to Quash from Max by not including Max in the mailing.

494. Howell did this in an effort to have second-degree criminal charges against Max, related to the Divorce Decree, pursued against Max by the State of Utah and to hide the more serious criminal actions of his client, and to prevent the State from charging Lauara. Howell's actions of blocking Max from obtaining his records, ordered by the divorce court as his property, is a continuation of Howell and his firm's Rule 60 fraud on the court blocking Max's efforts to have false criminal charges against him dismissed by the court.

495. Max was charged with second-degree felony auto theft for moving an old pickup,

awarded to Lauara, from the neighbor's property to his to remove items belonging to him and to do maintenance work on the vehicle. The vehicle was not hidden from Lauara. The vehicle had a key in it, and Lauara had her key to it. Prior to moving the vehicle, Max called the Sheriff and receive the Sheriff's permission. Max then called after he had moved the vehicle. The divorce court's order stated Max did not steal the vehicle.

496. Though the divorce court confirmed that Max did not steal the truck, Howell insisted to the Utah court that he did and pushed the false second-degree felony charges against Max that could result in several years in prison for Max. Howell's actions violated NRS 199.210 and NRS 207.285.

497. Max's subpoenas of information from Scott Brand would have had Lauara included in the State's criminal pursuit of violations of the divorce decree for her actions of stealing the company and keeping all the assets that were ordered by the divorce court to be split between them. .

498. Had the subpoenas been honored, the information gained would have resulted in either Lauara being added to the Utah charges against Max or more likely the dismissal of the case. Mr. Howell aided and abetted Lauara's fraud and theft, and covered up the criminal behavior of his client while pushing the false charges against Max.

> "Rule 60(d)(3) is the codification of a court's inherent power to investigate whether a judgment was obtained by fraudulent conduct," *Universal Oil Products Co. v. Root Ref. Co., 328 U.S. 575, 580 (1946).*

499. To further damage Max, Howell falsely stated there was a Diversion Agreement entered into in open court, "*whereby the prosecution of this matter was diverted with the intent that the case be dismissed approximately twelve months later upon Defendant's compliance with applicable terms and conditions.*"

500. This statement by Howell was knowingly false, there were no terms or conditions. Regarding the hold on the case for the purported stolen vehicle. This is URCP and NRCP Rule 60(b)(3) fraud on the court.

501. Howell knowingly and falsely stated in his Motion to Quash that Lauara had been awarded Mesa Business Services. Mesa Business Services did not exist until after the divorce.

502. The Couple owned Professional Services & Consulting (PSC). The divorce court ordered PSC closed and the assets disbursed.

503. In early September 2020 Lauara obtained a business license for Mesa Business Services and transferred the accounts and assets from PSC to the new company, Mesa Business Services. In late September 2022, once the accounts and assets were transferred, Lauara closed PSC.

504. Wendover Ambulance cannot do business without PSC or a similar company. PSC is now doing business as (dba) Mesa Business Services.

505. Lauara, Scott, and Howell refused Max's requests to provide him with the tax information, closure documentation, or $500,000 half the value of PSC. These individuals have never denied Max's assertion that PSC is worth $1,000.000.

506. Howell knowing filed, with the court, fabricated evidence in violation of NRS 207.360(13), URE Rule 609, and a violation of URCP and NRCP Rule 60(b)(3).

507. Howell aided and abetted Lauara in stealing hundreds of thousands of dollars from Max. This violates 76-2-202 of the Utah Code and NRS 207.360(27) and (28).

508. Howell covered up the criminal actions of his client, Lauara, and falsified the criminal charges against Max, insisting to the court they were going away once Max complied

with the court's order, "applicable terms and conditions."

509. Meador threatened Max for filing complaints against him and insinuated no one was going to enforce them.

510. Lauara and Meador knew they had committed fraud at trial and had gotten an unfair Decree. They acknowledged that Max would be able to recover his money in a malpractice suit against his attorney. This Court should order an investigation into all Defendants' actions by law enforcement.

## XIII. INTENTIONAL INFLICTION OF PAIN AND SUFFERING

511. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 510. as though fully set forth herein.

512. The conduct of the Defendants was intentional and with the knowledge that their conduct would cause Plaintiff severe emotional distress. The Defendants' actions were deliberate. Defendants engaged in conduct knowing it was inherently dangerous to and posed a substantial risk of harming Max and the Defendants did harm Max. There was nothing negligent in any of Defendant's actions; their malfeasance was orchestrated. Furthermore, the conduct of the Defendants was outrageous and wanton, amounting to willful, intentional, and reckless disregard for Max's rights thereby causing Max to suffer anxiety attacks, mental anguish, and severe emotional and physical distress. Max is thereby entitled to recover exemplary punitive damages to set an example and punish the Defendants and deter their wrongdoing in the future.

## XIII. PAST DAMAGES

513. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. Through 512. as though fully set forth herein.

514. Max is entitled to the damages alleged and set forth above.

## XIV. FUTURE DAMAGES

515. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 514. as though fully set forth herein.

516. Max requests restitution yet to be determined of the losses incurred and the losses on-going to Max as a result of Defendant's wrongful and illegal actions, including interest in an amount to be proven at trial.

## XV. UNJUST ENRICHMENT

517. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 516. as though fully set forth herein.

518. Max is entitled to restitution of money wrongfully retained by Defendants as a result of their wrongful acts in an amount proven at trial.

519. Max is entitled to interest on the damages according to proof at the legal rate; and

520.

For costs of suit herein incurred.

## XVI. PUNITIVE DAMAGES

521. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 520. as though fully set forth herein.

> Section NRS 42.005 if the Defendant acts with oppression, fraud, or malice, you may receive punitive damages regardless of the extent of your injuries. 42.005 imposes punitive damages caps. **If the damages are $100,000 or more** – The victim can receive three times their compensatory damages in punitive damages
>
> *See also* Safeway Stores, Inc. v. Vance, 355 U.S. 389 (1958).

522. Max's argument herein above confirms he is entitled to special and punitive damages and interest at the legal rate for the costs of the suit herein incurred.

## XVII. ATTORNEY FEES

523. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 538. as though fully set forth herein

524. Lauara used her attorneys in the furtherance of a current or a planned crime of fraud. Therefore, the crime-fraud exception applies to their work product privilege as well as the attorney-client privilege. The Defendants lose both.

525. Max retired on a disability in 2007. He had been out of debt since approximately 1980 and owned his home free and clear.

526. In 1978, Max began building his Utah home. Max built, owned, and raised his family in the home. Lauara stated Max's Utah home had a value of $1.2 million without water.

527. When the couple married in 2001 Lauara was deeply in debt. She began secretly and illegally absconding Max's assets/. Her property was in debt in 2005, Max's was paid off.

528. Lauara's debt required putting Max and his assets on the 2005 SBA Financial Statement to cover the loans when the Nevada businesses were purchased from Lauara's ex-husband.

529. Max assisted Lauara in paying off the Nevada Businesses and home.

530. Following the unlawful behavior of Lauara and her attorneys' unlawful behavior,

Lauara now owns all the Nevada property including the businesses and has liens on Max's property for approximately one million dollars.

531. Lauara testified she and Max had an ideal life. They were retired and traveled in their motorhome.

532. Max's life since Lauara left in 2017, has been anything but ideal. As a result of Lauara and her attorneys' fraudulent behavior, Max was forced to sell his water rights, destroying the value of his home, and forced to sell his tools, trailers, and building materials to help pay his costs going forward in this action.

533. The values of the tools and building materials are estimated at $10,000, and the trailers are $5,000.

534. At the time of the sale, the value of the water shares is $186,000. In her 2020 financial statement, Lauara stated Max's home was worth $1,200,000 without the water shares. The Nevada Court of Appeals ordered that Lauara's financial statement set the values of the property. Defendants are therefore required to purchase Max's home for treble the valuations set by Lauara and for treble the valuation of the water shares.

535. Defendant attorneys were paid from Lauara's IRAs which were community funds.

536. Defendant's attorneys had indicated their fees are more than $500,000 for which they are liable to reimburse Max.

**Damages:**

1.

| | | |
|---|---|---|
| 1. | Motorhome, | $97,500 + out of pocket expenses. |
| 2. | Repairs to the motorhome | $80,000-100,000 estimate |
| 3. | F550 pickup, | $50,000 + whatever it costs to upgrade. |
| 4. | Max's Utah home | $1,200,000, Defendants order to purchase |
| 5. | 50% of the value of PSC. | $500,000. |
| 6. | Wendover Ambulance | $2,000,000 |

| | | | |
|---|---|---|---|
| 7. | Loans to Adam | | $1,890,000 + continuing amortization interest |
| 8. | Max's disability Pension. | | $10,000 + the continuing payments |
| 9. | Lauara's legal fees. | | $500,000 + any additional. |
| 10. | Max's disability account. | | $352,856 + interest. |
| 11. | Max's NV judgments | | |
| | a. | judgments. | $715,487.85 |
| 12. | Water shares to Lauara | | $42,000 + |
| 13. | Taxes on Max's IRA withdrawal | | $60,000 + |
| 14. | Loans to Mt. West to buy WAS | | $315,517+ interest |
| 15. | Half the NV community prop. | | $1,000,000. |
| 16. | Quitclaimed NV Prop.to Lauara | | $62,500.00 + interest. Florence Street |
| 17. | Half the value of the NV home | | $80,000+ interest |
| 18, | Payments from Max's pension | | $10,000+ plus interest |
| 19. | Max's attorney fees Nevada: | | |
| | a. | <u>Wasilewski</u> | $59,850 |
| | | Sanction | $8,531 |
| | | NC depositions | $10,141 |
| | b. | <u>Amens</u> | $79,571.24 |
| | | owed | $27,500.00 |
| | c. | <u>Bushur</u> | $41,500.00 |
| | d. | <u>Heideman</u> | $150,000 |
| | e. | Mendez | $350.00 |
| | f. | Anderson Fam. Law | $300.00 |
| | g. | Mustoe Law | $295.00 |
| | h. | Mike Kolsch | $125.00 |
| | i. | Jonathan King Reno | $150.00 |
| | j. | Misc. expenses NC | $5,000.00 |
| | k. | Jared Peterson | $? |
| Max's attorneys North Carolina | | | |
| | a. | Cooper | $28,770.15 |
| | owed | | $37,274.56 |
| | sanctioned | | $14,845.00 |
| | b. | Alex Heroy | $50,000 |
| | | NC Judgment | $85,000.00 |
| | c. | Arbitration | $600.00 |
| | d. | Howell attorney fees | $7,742.50 |
| | e. | Blue Bee bankruptcy | $9,302.00 |
| | f. | 1st trip to NC Hearing | $6,000.00 |
| 20. | Max's 31 shares of water | | $186,000+ interest |
| 21. | Sold personal property | | $10,000+ interest |
| 22. | Lauara removed from Businesses Oct/Nov, 2017 | | $913,956 + interest |
| 23. | False home improvements to Max's house | | $260,000 |
| 24. | Half Lauara's IRAs disbursements | | $165,000 ( half of $309,000 - $76,000) |
| 25. | Lauara award from Max IRA | | $54,000 |

| | | |
|---|---|---|
| 26. | Unfair split of vehicles | $50,000 |
| 27. | Lauara's loans to herself of | $204,188 =10% interest $600,000 est. |
| 28. | All Max's attorney fees going forward to be decided. | |
| 29. | Costs to move | $20,000. |
| 30. | Misc. copies, transcripts… | $28,009.04 through August 24, 2022. |
| 31. | Lauara's false loans to herself | $28,498. |
| 32. | Awarded $70K motorhome twice | $140,000. |

## XVIII. ELDER EXPLOITATION

537. Max realleges and incorporates by this reference all allegations set forth in paragraphs 1. through 536. as though fully set forth herein.

538. Max is currently seventy-five (75) years of age and was seventy (70) years of age when Lauara retained Meador, Kelley, and Woodburn.

539. Max has suffered a loss of over $10,821,000 from the Defendants' willful and egregious conduct described above.

540. Defendants had personal knowledge of Max's age at the time of the contract and that Max was retired on disability and a fixed income.

541. Defendants had personal knowledge of the grief and anguish they were causing Max.

542. Based on NRS 41.1395, Defendants owe Max double damages due to his status as an elderly person and the Defendants' knowledge of the same.

543. By doing these egregious acts, the Defendants have poisoned Max's community against Max which will make it necessary for him to relocate.

544. By doing the acts complained of herein, Defendants acted with oppression, fraud, and malice towards Max and intended to cause both mental and physical injury to him. The Defendants' conduct subjected Max to cruel and unjust hardship in conscious disregard for

Max's rights, and Max's health. Because of the despicable and egregious conduct of Defendants, as herein alleged, Max is entitled to double damages and does hereby demand punitive or exemplary damages in a sum to be proven at trial sufficient to punish Defendants from so acting in the future. Defendants knew their acts violated the law. They should be held accountable for their actions both legally to the state(s) in which they were performed and financially to Max et al.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. Under NRS 155.165(1) Meador and Lauara were vexatious litigants for unreasonably opposing and frustrating Max's efforts when Max was acting in a good faith effort to enforce his rights, and Lauara and her attorneys were forging orders, fabricating evidence, committing, and suborning perjury…

2. For general, specific, compensatory, incidental, and consequential damages according to proof at trial, but in an amount not less than $10,821,000;

3. For exemplary damages according to proof;

4. For pre and post-judgment interest as allowed by law;

5. For an award of costs of suit incurred in this and future actions;

6. For an award of attorney fees incurred in this and future actions;

7. For such other and further relief as the Court may deem proper;

8. For an unequal distribution of property in Max's favor.

9. For special, and punitive damages three times his actual damages as provided by NRS 41.580, NRS 41.335, NRS 41.337, and NRS 207.470.

10. For criminal charges against Defendants for their unlawful activities.

DATED: this 30th day of November 2022

By: */s/ Raymond Max Snyder*

Raymond Max Snyder

SECOND JUDICIAL DISTRICT COURT
COUNTY OF WASHOE, STATE OF NEVADA

**AFFIRMATION**
**Pursuant to MRS 239B.030 and 603A.040**

The undersigned does hereby affirm that the preceding document, COMPLAINT, filed in case number: ______________________________________.

Document does not contain the personal information of any person.

DATED this 30th day of November, 2022.

Submitted By: *_/s/ Raymond Max Snyder_*

Raymond Max Snyder Pro se.
PO Box 69
Aurora, Utah 84620
Phone: (801) 641-6844
email: maxsnyder@yahoo.com